**In the Matter of READING COMPANY, Debtor.**

**In Proceedings for the Reorganization of a Railroad**

**Bky. 71-828.**

United States District Court,
E. D. Pennsylvania.

May 2, 1974.

See also D.C., 361 F.Supp. 1351, 378 F.Supp. 481.

Howard H. Lewis, Philadelphia, Pa., for plaintiff.

James F. Dausch, U. S. Dept. of Justice, Washington, D. C., for U. S.

Gordon P. MacDougall, Washington, D. C., for Commonwealth of Pa.

David L. Grove, Philadelphia, Pa., for John W. Sullivan, John D. Mabie and Thomas A. Reynolds, Shareholders.

G. Clark Cummings, New York City, for Manufacturers Hanover Trust Co.

Leroy D. Touchton, Deputy Atty. Gen., Trenton, N. J., for State of New Jersey, for intervenors.

MEMORANDUM AND ORDER NO. 607, and DECISION REQUIRED BY THE FIRST SENTENCE OF § 207(b) OF THE REGIONAL RAIL REORGANIZATION ACT OF 1973.

DITTER, District Judge.

The Reading Company is a railroad that has been in reorganization under Section 77 of the Bankruptcy Act since November 23, 1971. It is one of several northeast railroads that are in grave financial difficulty. In order to ameliorate this situation and to provide essential rail service, Congress passed the Regional Rail Reorganization Act of 1973.

This Act requires that each district court having jurisdiction over a railroad in reorganization decide whether it is reorganizable on an income basis within a reasonable time under the Bankruptcy Act, 11 U.S.C. § 205, and whether the public interest would be best served by continuing with those proceedings. The alternative is reorganization under the new Rail Act. Pursuant to this mandate, public hearings were held on March 27, 1974, so that all interested parties could be heard. Based on the affidavits, testimony, and documentary evidence offered, I make the following:

FINDINGS OF FACT

1. The Reading Company is a bankrupt railroad presently in reorganization under Section 77 of the Bankruptcy Act.

2. The Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 et seq., was intended by Congress to provide for:

(1) The identification of a rail system in the midwest and northeast region which will be adequate to meet regional and national rail transportation requirements;

(2) The reorganization of railroads serving that area into an economically viable system; and

(3) The financial assistance and legal procedures to accomplish these purposes at the least possible cost to the general taxpayer.

3. The Act affords certain advantages to those railroads which are reorganized under its provisions as compared to those which are reorganized under Section 77 of the Bankruptcy Act, including:

(1) Simplified procedures for the abandonment of lines which are not profitable to operate;

(2) Federal subsidies to provide compensation for employees whose services are no longer required; and

(3) The possibility of simplified criteria for obtaining interim financial assistance.

4. At least six suits have been brought, however, to challenge the constitutionality of the Act. No decision has been rendered in any of these proceedings.

5. Reading operates 1,138 miles of track in eastern Pennsylvania and New Jersey, provides essential commuter and freight service, and had operating reve-

nues of $125,813,000 and assets of $315,038,000 in 1973.

6. In each of the last five years, Debtor's rail operation expenses have exceeded its rail operation revenues so that there has been a net operating loss. These losses were partially offset by non-operating income, but when fixed charges consisting of leased-line rentals, interest on equipment obligations, and accrued interest on securities were added, Debtor's net losses have been as follows:

|  | 1969 | 1970 | 1971 | 1972 | 1973 |
|---|---|---|---|---|---|
|  |  |  | (in thousands) |  |  |
| Net Railway Operating Loss | 603 | 2,309 | 5,776 | 12,126 | 8,677 |
| Other Income | 3,204 | 2,629 | 481 | 14 | 1,520 |
| Fixed Charges | 5,921 | 5,946 | 6,454 | 6,094 | 5,545 |
| Extraordinary Income or (Loss) | (69) | (6,610) | 200 | (1,849) | —— |
| Net Loss | $3,389 | $12,236 | $11,549 | $20,083 | $12,702 |

7. Without providing for the impact on operations that the Rail Act of 1973 will have if it is held to be constitutional, Reading estimates it will have a net operating loss in 1974, a net operating profit in 1975, but net losses in both years as set forth below. Realistic projections and evaluations beyond 1975 are impossible with the information presently available to Debtor.

|  | 1974 | 1975 |
|---|---|---|
|  | (in thousands) | (in thousands) |
| Net Railway Operating Income (Loss) | ($1,550) | $3,600 |
| Other Income | 1,450 | 1,000 |
| Fixed Charges | 5,800 | 6,000 |
| Net Loss | $5,900 | $1,400 |

8. Reading's estimates for 1974 and 1975 are based on the assumption that carloadings will continue to increase, labor costs will rise only four per cent per year, the Interstate Commerce Commission will continue to grant freight-rate increases to offset inflation, and a favorable economic climate for rail operations will exist. Overall, these projections must be considered optimistic.

9. Debtor's trustees have explored all reasonably possible alternatives which would permit reorganization under Section 77 of the Bankruptcy Act including:

(1) The transfer of its commuter responsibilities and resulting losses to the Southeastern Pennsylvania Transportation Authority (SEPTA);

(2) Combination with other bankrupt carriers to create a profitable rail system, referred to for planning purposes as the Mid-Atlantic Railroad Company (MARC);

(3) The abandonment of certain branch lines and marginal operations to create a "core" system that would be profitable; and

(4) Acquisition of Debtor's estate by an existing profitable rail system.

10. Reading has suffered losses on its commuter operations for 29 years. Since 1960 public support payments have been made to offset some of Debtor's losses. In 1973, Debtor and SEPTA, an authority established to provide public transportation in southeastern Pennsylvania, entered into a Memorandum of Understanding which contemplated SEPTA's assuming full responsibility for much of Reading's commuter operations in return for which Debtor would transfer to SEPTA equipment and properties used by and associated with the commuter services. The Memorandum of Under-

standing was approved by this Court on June 7, 1973. That order was vacated, however, on March 22, 1974, by the Court of Appeals with the direction that the agreement be reconsidered in light of the Regional Rail Reorganization Act which had been adopted in the meantime. Thus, SEPTA's assumption of responsibility for the commuter losses must await the decisions to be made in connection with the Act.

11. A plan which contemplates the consolidation of the Reading, Lehigh Valley Railroad Company, Central Railroad Company of New Jersey, and the Lehigh and Hudson River Railway Company, all of which are in reorganization under Section 77 of the Bankruptcy Act, has been considered by Reading. For planning purposes this company has been referred to as the Mid-Atlantic Railroad Company (MARC). No source of funds, however, has been found for MARC's capitalization.

12. MARC could only survive as a viable entity if supported by and connected with a trunk line serving southern and western gateways, thus creating a system able to compete with the Penn Central. If MARC, or a similar company came into being outside the Regional Rail Reorganization Act, there is no prospect that it would be attractive to any trunk line.

13. There will be no public funds outside the Regional Rail Reorganization Act available for MARC, and so far, no other solvent railroad has agreed to finance the consolidation.

14. A study was made by the Debtor's staff about the feasibility of reducing the Reading's trackage to a "core" system by eliminating marginal branch lines, facilities, and service.

15. Implementing the core system would require massive abandonment and costly employee protection, and would not provide sufficient deficit reduction to permit the Debtor to reorganize on an income basis under Section 77 in the immediate future.

16. Reading has requested the Interstate Commerce Commission to require Chessie (Chesapeake and Ohio and Baltimore and Ohio Railroad Company) to include Debtor in the Chessie system, a request which is being resisted by Chessie.

17. Chessie does not have a duty or obligation under any Interstate Commerce Commission order to include the Reading within its system.

18. Further action on Reading's request was recently deferred by the Interstate Commerce Commission until the submission of a plan of reorganization under Section 77 by the Debtor.

19. Neither Chessie nor the Norfolk and Western Railroad have evinced an interest in acquiring some or all of Debtor's property as part of a Section 77 reorganization.

20. If Reading is reorganized under the Rail Act, the advantages the Act provides so far as funding employee benefits, permitting track abandonments, and interim financial support would be available to a consolidation of companies as envisioned by the MARC plan, or to acquiring rail systems such as Chessie or Norfolk and Western Railroad.

21. The Rail Act of 1973 provides for the creation of a financially self-sustaining rail system which will meet the transportation needs and service requirements of the region. It will be operated by a for-profit corporation to be known as the Consolidated Rail Corporation (Conrail).

22. If the Penn Central becomes a part of Conrail and Debtor does not, it is doubtful that Reading will be able to survive as an independent, competing entity because of Conrail's advantages in funding, equipment availability, service, business solicitation, and rate-making. Reading's competitive disadvantage will be multiplied if other railroads become a part of Conrail.

23. By reason of the deferred payment of taxes and fixed charges, Reading accrues obligations of between $8

and $9 million annually. This erosion of the Debtor's estate is expected to continue while it remains in reorganization.

24. If Debtor is not reorganized under the Rail Act of 1973, a period of five to ten years will be required to determine whether reorganization under Section 77 of the Bankruptcy Act is possible. It is unlikely that such reorganization can be achieved if Penn Central becomes a part of Conrail. In the meantime, the loss to Debtor's estate from the deferment of taxes and interest payments will increase. When this number of years and the erosion of Reading's assets are weighed against the possibilities of reorganization under Section 77, it is apparent that such reorganization cannot be achieved within a reasonable time.

## DISCUSSION

Section 207(b) of the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 717(b), requires that by May 2, 1974, this court decide whether Reading Company is reorganizable on an income basis within a reasonable time under Section 77 of the Bankruptcy Act, 11 U.S.C. § 205, and whether the public interest would be better served by the continuance of those proceedings as contrasted with reorganization under the Rail Act itself.

Suits have been brought challenging the constitutionality of the Rail Act, two in this district in connection with the

reorganization of the Penn Central.[1] Although a three judge court has been convened and it is likely that the cases in other districts will be transferred to this district and heard by the same panel, no immediate decision is forthcoming.

The Commonwealth of Pennsylvania has raised an additional constitutional question in the present proceeding. It contends that Congress has attempted to delegate to the court a legislative function, that is, a determination as to how the public interest will best be served. I have considered this argument and reject it for the reasons set forth by the Honorable John P. Fullam to whom it was also presented in the Penn Central reorganization.[2]

A Section 77 reorganization "on an income basis," as contemplated by the Rail Act, means that a railroad must be able to generate sufficient revenues to cover operating costs and fixed expenses.[3] The future earning power of the railroad is the primary criterion.[4] If there is no potential for income, there is obviously no reasonable prospect for independent survival and contribution to essential transportation needs.

A brief review of Reading's income history reveals that progress has been made in cutting losses, but not enough to convince me that reorganization under Section 77 is possible because eventual earning capacity is reasonably assured.

---

1. General Insurance Corp. v. United States Railway Association, Civil Action 74–189, and Manufacturers Hanover Trust Co. v. United States Railway Association, Civil Action 74–332.

2. In re Penn Central Transportation Company Bankruptcy No. 70–347, Order No. 1543, May 2, 1974, and Memorandum, Docket No. 7468, at 7–10, May 2, 1974, 382 F.Supp. 831.

3. 11 U.S.C. § 205(b) provides:
   A plan of reorganization . . .
   (4) shall provide for fixed charges (including fixed interest on funded debt, interest or unfunded debt, amortization of discount on funded debt, and rent for leased rail-

roads) in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof . . .

4. See Group of Institutional Investors v. Chicago, M. St. P. & P. R. R., 318 U.S. 523, 540, 63 S.Ct. 727, 738, 87 L.Ed. 959 (1943), and In Re Boston & Providence Railroad Corp., 143 F.Supp. 866, 874 (D.Mass.1956), aff'd in part, vacated in part, 250 F.2d 463 (1st Cir. 1957), cert. denied, 356 U.S. 939, 78 S.Ct. 781, 2 L.Ed.2d 813, rehearing denied, 357 U.S. 915, 78 S.Ct. 1147, 2 L.Ed.2d 1163 (1958).

In 1971, the year Reading filed for reorganization, it had a Net Railway Operating Income (NROI) loss of $5.7 million and a net ordinary loss of $11.5 million.[5] In 1972 the operating losses rose to $12.1 million and $20 million for net ordinary loss. Much improvement followed in 1973 and the operating loss was only $8.7 million and the net ordinary loss was $12.7 million. The Reading has projected improved earnings in 1974 and 1975. It is expected that the Debtor will have an operating loss of $1.5 million and a net ordinary loss of $5.9 million in 1974. The actual figures of the Debtor's operations this January and February confirm this projection. For 1975 it is estimated that NROI should show a surplus of $3.6 million, however, net ordinary income will reflect a $1.4 million loss.

The improved income projections for 1974 and 1975 are based on assumptions that lead me to believe the estimates may be overly optimistic. First, in calculating future operating expenses, the Debtor relied upon incurring an annual wage increase of only four per cent per year despite the present rate of inflation and the termination of wage controls. Second, the Debtor assumed that it would be granted freight rate increases to offset rising costs due to inflation. Finally, because of various economic factors, especially an increase in the use of coal due to the energy shortage, increased carloadings are projected for the next two years. Even if the increase in carloadings is achieved, the Debtor would still handle fewer carloadings than it did in 1970.

Moreover, the potential competition of the Consolidated Rail Corporation (Conrail) and the unsettled economic and environmental conditions make it impossible to forecast with certainty sufficient future earnings to provide a basis for the recapitalization of the Debtor.

Evidence was introduced that Conrail, as contemplated by the Regional Rail Reorganization Act, will provide ruinous competition to the Debtor. Added to the natural advantage of size and being able to deal with shippers in a monopolistic manner, the Act will allow Conrail to operate without a debt structure, to abandon unprofitable lines rapidly, to receive subsidies, to compensate employees who are laid off, and to obtain federal financial assistance to improve its physical plant.

Furthermore, there is a great deal of uncertainty whether the country's energy problems will lead to a long-term increase in the use of coal, the major factor upon which projected increases in carloadings were based. Although recent freight rate increases were helpful in improving Debtor's net income, there is no guarantee that future rate increases will be granted to offset higher costs due to inflation.

There has been no concrete evidence presented by any party that the Reading could be successfully reorganized on an income basis under Section 77. This is not due to any lack of diligence on the part of the Trustees.[6] They considered various alternatives, but none of them assure a successful, income-based reorganization.

Among the possibilities explored, one study related to the creation of a new railroad, the Mid-Atlantic Railroad Company (MARC), from four bankrupt lines, the Reading, Lehigh Valley, Central Railroad of New Jersey, and Lehigh and Hudson River Railway Company. The proposal recognized that the full potential of MARC would only be achieved if it was supported by a major railroad that had connections with southern and western United States.

It does not seem possible that MARC can be implemented at this time. The Reading has no positive indication that any major trunk line is willing to connect with a MARC-type system. Neither Chessie nor the Norfolk and Western Railroad are interested in MARC as long

---

5. The difference between the two for the most part represents fixed charges.

6. One of the Trustees, the Honorable Richardson Dilworth, died January 23, 1974. His successor has just been named.

as there remains the possibility of obtaining part or all of it under the liberal loan, labor, and abandonment provisions of the Regional Rail Reorganization Act.

Another study was made by the Debtor which proposed reduction to a "core" system as a possible method of reorganization. Under this proposal, unprofitable branch lines, facilities, and services would be abandoned, thereby eliminating large portions of the Reading system. However, if the Debtor attempted to implement this plan it would be faced with drawn-out hearings before the Interstate Commerce Commission over abandonments and the possibility of having to recompense furloughed employees with up to five years wages. Furthermore, even if the core system were to be implemented, under present conditions it would not provide sufficient NROI for the Debtor to be able to reorganize on an income basis.

The Commonwealth of Pennsylvania charges that the Trustee has ignored the opportunity offered by the Interstate Commerce Commission for the merger of the Debtor into the Chessie system. The Commonwealth contends that Chessie is obligated to include the Reading and cites for its authority a decision by the ICC, Chesapeake & O. Ry. Control-Western M. Ry., 328 I.C.C. 684 (1967), as amended by order of February 23, 1968. A close examination of the ICC decision, however, does not support the Commonwealth's contention. What in fact happened was that the Reading and the CNJ had a long-established relationship with the Western Maryland and Norfolk and Western railroads. When Chessie petitioned for control of Western Maryland, the Reading and CNJ (Reading owns almost 50 per cent of CNJ's stock) petitioned the ICC to require Chessie to include them in the Chessie system. The Commission deferred consideration of the Reading's petition until hearings were held on a proposed merger of Chessie and the Norfolk and Western. The Commission felt the C & O-N & W merger case a more appropriate place to determine the ultimate relationships of the parties. Subsequently the C & O-N & W merger was called off.

More recently, the Commission issued an order dated December 19, 1973, in which the Reading's petition was further considered. The Commission decided that the Reading's petition should be deferred until the Debtor files a plan of reorganization under Section 77. Under present circumstances, this may well mean a delay of from five to ten years.

As of today Chessie is resisting the inclusion of Reading in its system. Thus, at most the ICC might consider ordering the incorporation of Debtor in Chessie but not at this time.

It is not difficult to understand why both Chessie and Norfolk and Western now oppose the inclusion of Reading in their systems. If either did take over the property of the Debtor, it would have to go through the complex abandonment procedures of the ICC, be liable for large compensation payments to employees who are laid off, and be burdened with Reading's commuter problems. But if either acquires some or all of the Debtor under the Regional Rail Reorganization Act of 1973, it would be eligible for all the benefits of the Act.

The Reading correctly contends that so long as it is being reorganized under Section 77, no profitable railroad will show any interest in Debtor or any part of its properties. If these assets, though otherwise of potential economic value to another line, do not enjoy the additional benefits that will enure to them by reason of the Rail Act, an acquiring system will probably consider them of doubtful ultimate worth.

In summary, I have concluded that Reading has explored all feasible alternatives leading to possible reorganization under Section 77 but without success. It is apparent that Reading will not be able to compete with Conrail, or be attractive as an acquisition by a profitable rail system that will compete with Conrail, unless it takes advantage of the provisions of the Rail Act which permit easier abandonments, provide subsidies to compensate employees whose jobs are

eliminated and grant interim financial help. Even if there was no Conrail and no Rail Act of 1973, there has been no showing that assures me that Reading can become a viable entity in tomorrow's uncertain economic and ecological climate.

Since I have concluded that Debtor is not reorganizable on an income basis within a reasonable time under Section 77, there is no need to consider the public interest question which is also posed by the Rail Act. Of course, if the Rail Act is found to be unconstitutional, Reading's whole problem must be reviewed under the circumstances as they will then exist.

See also, D.C., 378 F.Supp. 474.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction under 45 U.S.C. § 717(b).

2. Debtor has explored all feasible alternatives to make reorganization under Section 77 of the Bankruptcy Act possible.

3. The Debtor is not reorganizable on an income basis within a reasonable time under Section 77 of the Bankruptcy Act, and therefore no decision need be made as to whether the public interest would be better served by reorganization under Section 77 than by reorganization under the Regional Rail Reorganization Act of 1973.