423 F.Supp. 941 (1976)
CONSOLIDATED RAIL CORPORATION, Plaintiff,
v.
STATE OF ILLINOIS et al., Defendants.
Civ. A. No. 76-9.
Special Court, Regional Rail Reorganization Act.
November 29, 1976.
Certiorari Denied February 22, 1977.
*942 *943 John G. Harkins, Jr., Laurence Z. Shiekman, Charles J. Bloom, Kenneth I. Levin, Katherine K. Dodd, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for the plaintiff Consolidated Rail Corp.
James H. Heller, Washington, D.C., William J. Scott, Atty. Gen., State of Illinois, Springfield, Ill., Kevin B. McCarthy, Asst. Chief Counsel, Illinois Dept. of Transp., State of Illinois, Homewood, Ill., John P. Meyer, Sp. Asst. Atty. Gen., State of Illinois, Danville, Ill., for the defendants State of Illinois.
Howard M. Wilchins, Gearold K. Knowles, Cary W. Dickieson, Gen. Counsel, United States Railway Assn., Washington, D.C., for the intervenor U.S. Railway Assn.
Emried D. Cole, Jr., Louisville, Ky., for the intervenor Louisville & Nashville Railroad Co.
Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.
Certiorari Denied February 22, 1977. See 97 S.Ct. 1111.
WISDOM, Judge:
This action raises important questions relating to the Special Court's exclusive jurisdiction, construction of the Rail Act,[1] and the integrity of the Final System Plan (FSP)[2]. ConRail moved in this Court for a *944 declaratory judgment and for injunctive relief against enforcement of a permanent injunction issued August 18, 1976, in State of Illinois, et al.[3]v. Consolidated Rail Corp., No. 76-2-042 (E.D.Ill.1976). In that case the district court enjoined ConRail and the L & N from operating ConRail trains or equipment, under certain trackage agreements, over the lines of the L & N between Carmi and Danville, Illinois, by way of Evansville, Indiana, until the Interstate Commerce Commission approved such operations.[4] In this Court the State of Illinois moves to dismiss ConRail's complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. We grant the declaratory judgment and preliminary injunction sought by ConRail. We deny the State's motion to dismiss the complaint.

I. Factual Background
The dispute in this case concerns 63.4 miles of track between Paris and Lawrenceville, Illinois. This track is a segment of the Cairo Branch which, before April 1, 1976, was owned by the Penn Central Transportation Company. The Cairo Branch is located within the State of Illinois and extends from Cairo northward through Carmi, Mt. Carmel, Lawrenceville, Paris, and Danville to Chicago. This Branch is one of several north-south freight lines connecting the coal fields of southern Illinois and Indiana with the Chicago area. It is a light density line in "a terrible state of repair";[5] if used as a route for north-south through traffic, it would have to be extensively upgraded. As a consequence, in constructing the FSP the USRA considered the feasibility of routing ConRail traffic over connecting, well-maintained lines of solvent carriers as an alternative to conveyance of the entire Cairo Branch to ConRail. After extensive public hearings on the subject, USRA determined that ConRail traffic destined for Chicago should bypass part of the Cairo Branch and be routed over connecting trackage of solvent carriers  either on all L & N trackage from Carmi, Illinois east to Evansville, Indiana, and then north to Vincennes, Indiana and Danville, Illinois; or from Carmi to Lawrenceville, Illinois on ConRail track, east to Vincennes on B & O track and then north to Danville on L & N track.[6] In either event, through freight service to Chicago would not travel over the Paris-Lawrenceville section of the Cairo Branch but instead over the Vincennes-Danville track of the L & N. In exchange the L & N would be offered trackage rights into the southern Illinois coal fields on lines designated for conveyance to ConRail. The result would enable ConRail to consolidate its coal flow from southern Illinois and southern Indiana to Chicago over an existing high-capacity and well-maintained railroad. The L & N would be benefitted by payments from ConRail for the use of the tracks; ConRail would avoid the expense of upgrading the Cairo line. The rerouting would therefore improve the operating efficiency of ConRail and the shipper service for the area served. I FSP at 30.
Accordingly, in the FSP the USRA designated to ConRail that portion of the Cairo Branch extending from Cairo to Lawrenceville. Beyond Lawrenceville, however, the 63.4 mile portion northward to Paris was designated to ConRail only if the L & N trackage rights "cannot be obtained". See II FSP at 65-69. "[I]f the necessary trackage rights over the L & N are acquired", the bypassed Lawrenceville to Paris portion of the Cairo Branch would remain the property of the Penn Central and be available *945 for subsidy by the State of Illinois under Section 304 of the Rail Act.[7] It is clear then that ConRail's use of L & N trackage rights for the 63.4 miles in dispute was part of USRA's master plan and the designation of the offers of L & N's trackage rights could be defeated only if ConRail failed to obtain the timely execution of an agreement with L & N.
The trackage rights contract was executed by ConRail and L & N covering the L & N tracks north to Danville. The contract was executed on February 10, 1975, but was dated February 12, 1975. The State of Illinois contends that the agreement was invalid, because it was not concluded within the limitation period of Section 206(d)(4) (95 days from November 9, 1975, the effective date of the FSP). See Part IV of this opinion.
Beginning on April 1, 1976, ConRail began diverting its through coal traffic from the old Cairo Branch to the L & N tracks via Carmi-Evansville-Vincennes. On August 5, 1976, the State obtained a temporary restraining order in the district court in the eastern district of Illinois. On August 18, the district court granted a permanent injunction against ConRail, holding that the L & N trackage agreement was not timely concluded within the meaning of § 206(d)(4) of the Act and forbidding ConRail from continuing such operations without Interstate Commerce Commission (I.C.C.) approval under 49 U.S.C § 1(18). ConRail appealed to the Seventh Circuit Court of Appeals on August 18. Although ConRail sought a stay of execution from the district court, which was denied, it did not seek a stay from the Seventh Circuit.
The interim solution sought by ConRail and L & N, while the appeal was pending in the Seventh Circuit, was the publication of a joint tariff on August 25 and 26 which would permit operation of ConRail coal trains over the same L & N trackage. The State of Illinois contested the tariff pursuant to I.C.C. rules and requested that the tariff be suspended pending investigation. The I.C.C. declined this request, but did begin an investigation. The tariff became effective on August 31, 1976, and will expire on December 31, 1976.
On September 1, 1976, before ConRail's request for a preliminary injunction in the instant proceeding, Illinois served on ConRail a notice of arbitration, purportedly authorized under Article XII of the ConRail-Illinois Operating Agreement, see footnote 7. The notice alleged that the issue of ConRail's diversion of coal traffic from the Lawrenceville-Paris section was arbitrable and that the diversion was in violation of the agreement. ConRail's motion requests injunctive relief to restrain the State of Illinois from proceeding with its notice of arbitration. The State of Illinois seeks dismissal of ConRail's complaint and enforcement of the arbitration.

II. Jurisdiction
The threshold question in this proceeding is whether the action brought in the Illinois district court was within our exclusive jurisdiction. Although the arguments focused on several sections of the Act[8] as providing, vel non, foundations for *946 our claim of exclusive jurisdiction, the provision most obviously pertinent is § 209(e)(1)(C) which states that:
Notwithstanding any other provision of law, any civil action ... challenging the legality of any action of the Association, or any failure of the Association to take any action, pursuant to authority conferred or purportedly conferred under this Act ... shall be within the original and exclusive jurisdiction of the special court.
The statutory language on its face seems clear in requiring a challenge to Association action or inaction.
The critical determination is, then, the extent to which USRA's actions or inactions were challenged in the matters that led to the Illinois district court proceeding. USRA did not, in terms, require ConRail and L & N to conclude an agreement, nor was the original designation by USRA of L & N trackage challenged. In addition, the Illinois-ConRail Operating Agreement was not negotiated by USRA, nor does the interpretation of the agreement directly involve USRA.
Inquiry in greater depth persuades us, however, that the district court action violated our exclusive jurisdiction. The basis of the Illinois complaint that I.C.C. approval was required for Carmi-Evansville-Vincennes-Danville operations by ConRail was that the L & N trackage agreement was not timely under § 206(d)(4). The fact of untimeliness, according to II FSP, pp. 65-69, triggers the alternative requirement that the Paris-Lawrenceville segment of the old Penn Central be considered automatically designated. As was said in regard to Segment 605a, FSP, a portion of the Paris-Lawrenceville line: "If the necessary trackage rights over the L & N cannot be obtained, this portion of the Cairo Branch shall be transferred to Consolidated Rail Corp." (emphasis added). If Illinois were correct that the ConRail-L & N trackage agreement was not timely concluded, the Paris-Lawrenceville segment of the Cairo line should have been conveyed to ConRail, for the condition necessary for its effective *947 designation was fulfilled. The action by Illinois in the district court, then, implicitly challenged the legality of the USRA's not certifying the Paris-Lawrenceville segment for conveyance.
As further support for the conclusion that § 209(e)(1)(C) applies, we note that the district court proceeding drew into question determinations as to the validity of the ConRail-L & N agreement in that USRA failed to designate Cairo pursuant to § 208(d) which allows for additional designations. Again USRA's failure to include the Paris-Lawrenceville segment is implicitly challenged.
We conclude that USRA's actions were sufficiently connected to the proceedings in the Illinois district court to satisfy the requirements of § 209(e)(1)(C). We note that any possible apprehension based on our determination today that the Special Court will be inundated with contract claims that bear a relation to the Act is misconceived. The major fact in the present case that allows for exclusive jurisdiction is the conditional designation of the Paris-Lawrenceville segment of the Cairo line in the FSP. It is USRA's failure to certify this portion of the Cairo line for conveyance that provides its connection to this action. Absent the alternative designation, there would be little basis for finding that the district court action was a challenge to the actions of the USRA.[9]
We need not pause long in our consideration whether the well-pleaded complaint rule, applicable generally to the interpretation of "arising under" in 28 U.S.C. §§ 1331, 1338, applies here to § 209(e). There is no apparent reason, apart from considerations of symmetry, why it should apply in light of the extraordinary statutory power granted the Special Court to protect its jurisdiction and the need for this Court to preserve the integrity of the FSP and USRA's determinations in pursuance of the FSP and of the Act.

III. Res Judicata
Even if the assumption of jurisdiction by the district court was improper, Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938) and its progeny might suggest that principles of res judicata should bar collateral attack on the Illinois judgment.[10] Examination of the basis of the Stoll rule, however, convinces us that its application in the present context is inappropriate.
The basic problem presented is the extent to which litigated questions[11] of subject matter jurisdiction are to be protected from collateral attack. Although the policies of terminating litigation, avoiding inconsistent results, and repose, which support application of res judicata to questions of subject matter jurisdiction, may vindicate the general rule that litigated questions of subject matter jurisdiction cannot be collaterally attacked, the policy basis for the rule should make us wary of its procrustean application. Here, countervailing policy considerations support the conclusion that Congress, in passing the Act and § 209(e) in particular, intended to void determinations made by other courts, when these determinations were reserved for our exclusive consideration.[12] *948 The legislative mandate overpowers the general rule.
Kalb v. Feuerstein, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940), is the leading decision for the principle that the legislature may void judgments. In this case the Feuersteins began foreclosure proceedings against Kalb, a farmer, and his wife. Judgment of foreclosure was entered in the County Court of Walworth, Wisconsin. Congress then passed the Frazier-Lemke Act, and farmer Kalb's petition for composition and extension of time pursuant to that Act was duly filed and approved by the federal district court. The Frazier-Lemke Act was subsequently found unconstitutional in May of 1935. The federal court dismissed Kalb's petition and subsequently the sheriff sold his farm. The second Frazier-Lemke Act was then passed, the Kalbs' petition reinstituted, and after this, the sheriff's sale confirmed by the county court. The sheriff then ejected the Kalbs from the mortgaged farm.
The basic claim by the Kalbs was that the reinstatement of the petition under the second Frazier-Lemke Act divested the county court of jurisdiction to complete the foreclosure. On appeal the Supreme Court held that the statute specifically created an exception to the principle forbidding collateral attack. This was based on an interpretation of the purpose of the Bankruptcy Act, 11 U.S.C. 203 (Supp.1938), specifically § 75. The question of subject matter jurisdiction was not litigated, but Justice Black stated that this would make no difference: "[C]onsiderations as to whether the issue of jurisdiction was actually contested in the County Court, or whether it could have been contested, are not applicable where the plenary power of Congress ... has been exercised as in this Act." 308 U.S. at 444, 60 S.Ct. at 348. (Footnotes omitted).
Although Kalb certainly does not control our determination here, the analogy is persuasive. The Rail Act proposes to cure a depressing, deteriorating situation in rail transportation in the northeast region of the country. This Special Court bears primary responsibility in making certain that the work of the USRA is implemented effectively. The exclusive jurisdiction sections make clear that Congress desired that one court make these necessary determinations. It is not every challenge relating to the Act that Congress brought within our exclusive province but only those where the critical nature of the determination demands the consistent interpretation possible only when review is concentrated in a single court. The ambit of the the Special Court's exclusive jurisdiction was carefully considered by Congress. Congressional concern focused on providing for exclusive jurisdiction where the Special Court's central functions under the Rail Act were concerned while narrowing the exclusive jurisdiction to oust problems which could be effectively dealt with by other courts. The assumption was then that certain matters would be exclusively attended to by the Special Court, and congressional efforts were directed to determining which matters warranted sensitive treatment.
As originally framed in the 1975 Senate bill, exclusivity of the Special Court's jurisdiction was extremely broad, including virtually any action purportedly authorized by the Act. There was no limitation of the exclusive jurisdiction to challenges of the Railway Association's actions. S. 2718, 94th Cong., 1st Sess., § 602(b), would have added to § 209 of the Rail Act a provision that read:
(e) Civil Actions  (1) Notwithstanding any other provision of law, any action 
(A) for injunctive or other relief from the enforcement, operation, or execution of [the] Act or any provision thereof, or from any action taken pursuant *949 to authority purportedly conferred under this Act;
(B) challenging ... the illegality of any action or any failure to take action pursuant to authority conferred or purportedly conferred under this Act;
(C) to enforce or declare any rights under this Act;
. . . . .
shall be within the original and exclusive jurisdiction of the special court.
The Senate Report referring to this broad language noted that the new subsection (e) provided "that actions brought to challenge or to enforce or declare rights under or pursuant to the Act, the final system plan and the implementation of the final system plan, are within the original and exclusive jurisdiction of the special court. The jurisdiction of the special court extends to actions by interested parties or by the special court on its own motion, which may be required to give effect to the purposes of the Act and the goals of the final system plan." S.Rep.No.499, 94th Cong., 1st Sess. at 83.
The House bill, with similar language, also proposed creating a broad scope for Special Court exclusive jurisdiction. Section 910(h) of H.R. 10979 would have added the following language to § 209:
(e) INJUNCTIVE AND DECLARATORY ACTIONS.  Notwithstanding any other provisions of law, any action 
(1) for injunctive or other relief from operation, or execution of any part of this Act or from any action taken pursuant to authority purportedly conferred under this Act,
(2) for a declaratory judgment .. of the illegality of any action or of any failure to take action pursuant to authority conferred or purportedly conferred under this Act, or
(3) to enforce or declare rights under this Act,
shall be within the exclusive jurisdiction of the special court.
In Conference the language of the Senate and House bills was pruned by adding the requirement for exclusive jurisdiction that the suit be one challenging some action of the United States Railway Association, or seeking relief against USRA, rather than, for example, against ConRail, an interested solvent transferee, or a "financially responsible person". The Conference noted: "The conference substitute eliminates the provision giving the special court exclusive jurisdiction over any action to enforce or declare rights under the Rail Act of 1973. Many actions covered by this provision undoubtedly would be within the exclusive jurisdiction of the special court under other provisions of this bill, but still others may be of no concern to the central functions of the special court under the Rail Act of 1973, as amended." Report of the Committee of Conference, H.R.Rep.No.781, at 188 (1976). The limitations on exclusive jurisdiction imposed in Conference express Congress's view of the Special Court's "central functions". This careful inquiry by Congress requires the conclusion that USRA action is not to be interfered with by any other court, a goal that is best implemented by viewing the Act as voiding judgments inconsistent with our exclusive jurisdiction. Were we to view the Act differently, serious impediments would exist impairing the effective implementation of the Act. The present case is a paradigm of the kind of situation where our early unrestricted intervention is necessary; otherwise the implementation of USRA's efforts will be delayed indefinitely.
Congress found, as stated in § 101(a), that essential rail service is threatened with cessation because of rail properties having been permitted to deteriorate. The primary purpose of the Act, then, was "[t]he reorganization of railroads in this [North-east] region into an economically viable system capable of providing adequate and efficient service to the region." § 101(b)(2). The problem is immediate and of great magnitude. Delay, therefore, unnecessarily experienced is something Congress sought to avoid.
*950 It is not a sufficient answer that the appeal to the Seventh Circuit could correct the original error. There has already been delay, and further delay conflicts with the Act's objectives. USRA determinations, so critical to the effectiveness of this reorganization, were to be treated by this Court exclusively, and the carefully constructed exclusivity provision as well as the broader purposes of the Act indicate that infringements on our exclusive jurisdiction be deemed nullities.
The fact that Congress intended to void judgments inconsistent with our exclusive jurisdiction is further buttressed by § 209(g), which gives this Court power to enjoin any court proceeding, other than in the Supreme Court, inconsistent with the effective implementation of the Act. This extraordinary power lends additional support to the conclusion that Congress intended that certain decisions be made in the Special Court only and without delay. It is our view then that Congress intended that determinations made by other courts, which determinations come within our exclusive jurisdiction, are void.
In sum, the purposes of the Act and the language of the Act, particularly that of §§ 101(a), 101(b)(2), and 209(e)(1)(C), compel us to hold that Congress concluded that the policies supporting our exclusive jurisdiction outweigh the policies of res judicata. United States v. United States Fidelity and Guaranty Company, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940); Restatement, Judgments § 10 (1940); Restatement 2d, Conflict of Laws, § 97, Commentary d. (1969); In re Penn Central Trans. Co., 384 F. Supp. 895, 914 (Sp.Ct.R.R.R.A.1974).[13]
While ConRail's course of litigating the jurisdictional issue in another court rather than coming to us for an injunction is not to be commended and, we trust, will not be repeated, we must enforce what we take to be the will of Congress.

IV. Timely Conclusion of the ConRail-L & N Trackage Agreement
As stated, jurisdiction in this case is based on § 209(e)(1)(C). See Part II of this opinion. The standard of review is set forth in § 209(e)(1). In pertinent part, this reads:
Relief shall not be granted in any action referred to in subparagraph (A), (C), or (E) unless the person seeking such relief establishes that the Association acted in deliberate or reckless disregard of applicable law.
The validity of the trackage agreement depends on whether it was timely concluded within the meaning of § 206(d)(4). This section requires that:
Where the final system plan designates specified rail properties of a profitable railroad operating in the region as authorized to be offered for sale or lease to the Corporation ..., such designation and authorization shall terminate 95 days after the effective date of the final system plan unless, prior to such date, a binding agreement with respect to such properties has been entered into and concluded.
We note at the outset that the determination of the meaning of the relevant terms in § 206(d)(4) is a question of federal law. We are not interpreting a contract in accordance with state law. And we are not concerned with the parol evidence rule of Illinois.[14] We are a federal court construing a *951 federal statute and acting under an unusually strong congressional mandate to give effect to the determinations of the USRA as long as that association does not act in "deliberate or reckless disregard of applicable law."
There was considerable dispute in the district court as to when the ConRail-L & N Agreement was "entered into and concluded" within the meaning of § 206(d)(4). It is undisputed, however, that the agreement was in fact executed on February 10, 1976, and post-dated February 12, 1976. The L & N was required to complete various labor agreements under Section 508(b). The trackage agreement was dated February 12, 1976, to allow for the execution of the labor agreements on February 11.[15] All parties agree that the trackage agreement was concluded at the latest by February 12, 1976.
The FSP became effective on November 9, 1975. The question is whether the February 12, 1976, date satisfies the 95 day requirement. The State contends that the 95th day was February 11. The district court agreed with the State. Rule 6(a) of the Federal Rules of Civil Procedure relating to computation of time states that the day of the event from which the designation period begins (November 9, 1975) is not included; the count would therefore begin with November 10.
Rule 6(a) establishes the method of computing "any period of time prescribed or allowed by these rules [of Federal Civil Procedure] ... or by any applicable statute." The Rules govern only the procedure of federal district courts, not substantive law, and hence, as Professor Moore observes, Rule 6(a) "does not provide a general rule of statutory construction which courts are bound to apply to all time periods mentioned in any statute". 2 Moore's Federal Practice § 6.06 at 1500.20 (2d Ed. 1975). But in computing various periods of time specified in a statute, a court may properly adopt, by analogy, the method of computation prescribed by Rule 6.
Our interpretation of the statute is that Congress did not intend to depart from the usual rule of computing a time limitation. Beginning with November 10 as the first day and counting to 95 gives February 12 as the last date before termination of the designation.
The language of the section supports this view: Section 206(d)(4) states that the designations are effective until "95 days after the effective date of the final system plan." When the section goes on to say "unless prior to such date", it means prior to midnight of the 95th day. The result of this counting is that February 12, 1976, is the last day on which an effective agreement could be reached.
We hold that the ConRail-L & N agreement was timely concluded within the meaning of § 206(d)(4). A fortiori, neither USRA's "determination" that the agreement was valid nor its failure to certify the Paris-Lawrenceville segment for conveyance was in "reckless or deliberate disregard of applicable law." § 209(e)(1)(C).

V. Standards Applicable to Issuance of Preliminary Injunction
This Court, in Trustees of the Property of Penn Central Transportation Co. v. Consolidated Rail Co., 421 F.Supp. 1055 (Sp.Ct.R.R.R.A.1976), accepted Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958) as enunciating the applicable standards governing the issuance of a preliminary injunction:
The controlling standards for the issuance of such an injunction in a case like this, where the public interest is deeply implicated, were classically stated .. [as] probability of success on the merits; irreparable injury to the proponent; *952 harm to the interested parties; and the public interest.
(A) As our discussion demonstrates, ConRail has an overwhelming probability of success on the merits.
(B) The only harm to Illinois is that it is restrained from interfering with ConRail's providing rail service over the L & N trackage. But Illinois would have been in this same position if it had originally complied with the USRA determinations regarding the ConRail-L & N trackage agreement. The financial harm to Illinois is no more than that contemplated by the FSP and specified in the financial calculations attached to its agreement with ConRail.
In this context ConRail need not show that unless the injunction issues "rigor mortis will set in forthwith." Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2d Cir. 1966). That the harm to ConRail cannot be repaired constitutes a sufficient showing. Id.
Although it would appear that ConRail is permitted to route shipments over the L & N as a consequence of the tariff filed with the I.C.C., at least until December 31, 1976, there is a sufficient showing of harm to ConRail. To begin, the tariff will expire on December 31 and it is not certain that a final decision by this Court will antedate the expiration date. The fact that the I.C.C. might approve a tariff extending beyond December 31 is not a certainty. Denial of the preliminary relief requested will frustrate further the tasks envisioned for ConRail in § 302 of the Act  the improvement in the efficiency of railroad operations.
(C) ConRail's operations pursuant to the congressionally approved FSP represent public interest planning by USRA. The Act and FSP aim toward the achievement of an efficient, viable rail transportation service in a large and important section of the country. Actions that interfere with the attainment of that goal seriously harm the public interest.
The balancing of interests in this case favor grant of the preliminary injunction.[16] The harm to Illinois is no more than that contemplated by the FSP. ConRail, on the other hand, appears likely to succeed on the merits, and its ability to pursue objectives important both to ConRail and to the public would be impaired if ConRail's request were denied. On balance, the interests in favor of preliminary relief to ConRail preponderate.

VI. Scope of the Preliminary Injunction
As for the arbitration, our only concern is that the arbitrators not predicate any conclusions on the basis of the invalidity of the ConRail-L & N trackage agreement. The arbitrators are enjoined from doing so. The State of Illinois and ConRail have no power to agree by arbitration to a review of the FSP or to a rewriting of USRA's determinations. In other respects the arbitration is not subject to the preliminary injunction.
In light of what we have said, this Court:
(1) Declares that the ConRail-L & N trackage rights agreement was timely entered into and concluded within the meaning of § 206(d)(4);
(2) Declares that the State of Illinois and the other defendants have no right of action and no right to arbitrate the issues of *953 the validity of the ConRail-L & N trackage agreement in any forum other than this Court and that the litigation of those issues in any other forum is a nullity;
(3) Preliminarily enjoins all defendants from seeking to enforce the injunction they obtained in the Illinois district court and from seeking resolution of the issue of the validity of the ConRail-L & N trackage agreement except in this Court; and
(4) Denies the State's motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.
NOTES
[1] The Regional Rail Reorganization Act of 1973, as amended.
[2] As in previous opinions of this Court the following abbreviations are used:

FSP - Final System Plan
USRA - United States Railway
 Association
ConRail - Consolidated Rail Corporation
L & N - Louisville and Nashville
 Railroad

[3] As appears in the style of this case, the defendants are the State of Illinois, four Illinois counties, two cities, and a state commission. For convenience, these defendants are referred to collectively as the State of Illinois or the State.
[4] Section 601(b) exempts from the operation of the Interstate Commerce Act actions that are in compliance with the requirements of the FSP.
[5] I FSP at 30. ConRail asserts that $6 million would be required initially to upgrade the track and roadbed.
[6] See I FSP 29-30, 267, 333, 334, 372-73; II FSP 65-67.
[7] Section 304 of the Rail Act contemplates subsidy operation of rail lines otherwise subject to abandonment by reason of those lines having been excluded from the FSP for conveyance to ConRail or a solvent carrier. ConRail reached an operating agreement with the State of Illinois on March 29, 1976, whereby ConRail would provide a rail freight service over the Paris-Lawrenceville section of the old Penn Central Cairo branch, the segment not conveyed to ConRail, in exchange for a subsidy from Illinois. The effective date of this agreement was April 1, 1976.
[8] The other sections claimed to provide bases for exclusive jurisdiction are §§ 209(b) and (e)(2).

Section 209(b) states:
(b) Special court.  Within 30 days after the date of enactment of this Act, the Association shall make application to the judicial panel on multi-district litigation authorized by section 1407 of Title 28, United States Code, for the consolidation in a single, three-judge district court of the United States of all judicial proceedings with respect to the final system plan. Within 30 days after such application is received, the panel shall make the consolidation in a district court (cited herein as the "special court") which the panel determines to be convenient to the parties and the one most likely to be able to conduct any proceedings under this section with the least delay and the greatest possible fairness and ability. Such proceedings shall be conducted by the special court which shall be composed of three Federal judges who shall be selected by the panel, except that none of the judges selected may be a judge assigned to a proceeding involving any railroad in reorganization in the region under section 77 of the Bankruptcy Act (11 U.S.C. 205). The special court is authorized to exercise the powers of a district judge in any judicial district with respect to such proceedings and such powers shall include those of a reorganization court. The special court shall have the power to order the conveyance of rail properties of railroads leased, operated, or controlled by a railroad in reorganization in the region. The special court may issue rules for the conduct of any proceedings under this section and under section 305 of this Act, including rules with respect to the time within which motions may be filed, and with respect to appropriate representation of interests not otherwise represented (including the Secretary with respect to a petition by the Association in the case of a proposal developed by the Secretary, under such section 305)....
Section 209(e)(2) states:
(e) Original and exclusive jurisdiction. 
. . . . .
(2) The original and exclusive jurisdiction of the special court shall include any action, whether filed by any interested person or initiated by the special court itself, to interpret, alter, amend, modify, or implement any of the orders entered by such court pursuant to section 303(b) of this Act in order to effect the purposes of this Act or the goals of the final system plan. During the pendency of any proceeding described in this paragraph, the special court may enter such orders as it determines to be appropriate, including orders enjoining, restraining, conditioning, or limiting any conveyance, transfer, or use of any asset or right which is subject to such an order or which is at issue in such a proceeding, or which involves the enforcement of any liens or encumbrances upon such assets or rights. Any orders pursuant to this paragraph which interpret, alter, amend, modify, or implement orders entered by the special court shall be final and shall not be restrained or enjoined by any court.
In light of our disposition, we need not consider whether these sections would apply in the present context.
[9] We express no view as to whether USRA's failure to make supplemental designations would alone be sufficient to sustain our exclusive jurisdiction as the issue is not before us.
[10] United States v. UMW, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940); Treinies v. Sunshine Mining Co.,, 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed.2d 85 (1939); Des Moines Navigation & R.R. v. Iowa Homestead Co.,, 123 U.S. 552, 8 S.Ct. 217, 31 L.Ed. 202 (1887); cf. Durfee v. Duke, 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963); Coe v. Coe, 334 U.S. 378, 68 S.Ct. 1094, 92 L.Ed. 1451 (1948).
[11] While it may be that non-litigated questions of subject matter jurisdiction are given the same res judicata effect as litigated questions, see Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940), we need not address that issue here. The question of subject matter jurisdiction was argued in the district court.
[12] See Dobbs, The Validation of Void Judgments: The Bootstrap Principle, 53 Va.L.Rev. 1003, 1241 (1967). Cf. Bosky & Braucher, Jurisdiction and Collateral Attack, 40 Colum.L. Rev. 1006 (1940); but cf., P. Bator, P. Mishkin, D. Shapiro, and H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System, pp. 841-44 (2d ed. 1973).
[13] Although in a different context, what we said in In re Penn Central is relevant here. In deciding whether we should refuse to consider relevant issues of law simply because they were also decided by another court, we said:

Congress envisioned a special role for this court, which in contrast to the Connecticut General court, can look at all the proceedings rather than only at one, and has available more ample factual records. We do not think Congress intended that in the cases which it put before us, raising issues of such major public importance, our review of the decisions of the district courts under the second sentence of § 207(b) should be trammeled by the decision of another court ....
[14] The district court in Illinois based its decision on the assumption, mistakenly, we believe, that Illinois law applied and that the parol evidence rule of Illinois forbade evidence showing that the ConRail-L & N agreement was concluded on February 10 or no later than February 11, 1976.
[15] There is apparently some dispute as to whether the labor agreements were completed by February 11. There seems to be no dispute, however, that the agreements were completed by February 12.
[16] Our power to grant the injunction is explicitly granted in § 209(g), which permits us to enjoin any court proceeding, other than in the Supreme Court, which impairs the effective implementation of the Rail Act. Arbitration may or may not be a part of a court proceeding. Section 209(g), however, should be read with reference to the purpose it sought to achieve. The Special Court is to protect against impairments of the Act and was given injunctive power to carry out this task. There is no policy basis for assuming that Congress granted this Court power to enjoin a court of appeals but left us powerless to prevent an arbitration which might impair the effective implementation of the Act. Particularly since § 1202(c) of the Operating Agreement makes the arbitration award enforceable in court as a matter of contract law, the quasi-judicial nature of the arbitration makes application of § 209(g) appropriate. We need not rely solely on § 209(g), however, as § 209(b) gives us the powers of a normal reorganization court and of a district judge in any judicial district. Thus § 209(b) supplies power to enjoin the arbitration.