The STATE OF NEW YORK, Plaintiff,

v.

SOLVENT CHEMICAL COMPANY, INC., Defendants.

And Related Actions.

No. 83–CV–1401C.

United States District Court, W.D. New York.

May 7, 1998.

Jaeckle, Fleischmann & Mugel, LLP (Dennis P. Harkawik, of counsel), Buffalo, NY, for Solvent Chemical Co., Inc.

Consolidated Rail Corp. (Rodney Griffith, Associate General Counsel—Environmental Law), Philadelphia, PA, for Consolidated Rail Corp.

## BACKGROUND

CURTIN, District Judge.

Currently before the court are (1) third-party defendant Consolidated Rail Corporation's ("Conrail") motion for summary judgment against third-party plaintiffs Solvent Chemical Co., Inc. ("Solvent"), Mader Capital, Inc. ("Mader"), and ICC Industries, Inc. ("ICC") (Item 268), and (2) Solvent's cross-motion for partial summary judgment against Conrail (Item 277). Oral argument on these motions was first held on December 16, 1994 (Item 335). After that, both Conrail and Solvent submitted numerous briefs and letters in support of their positions. The parties appeared for a final oral argument on these motions on Friday, April 24, 1998.

On December 3, 1983, the State of New York filed suit against Solvent, Mader, ICC, and three other defendants under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et. seq.*, and related state law for the costs of investigation and cleanup of a site at 3163 Buffalo Avenue, Niagara Falls, New York. In April 1994, Solvent, Mader, and ICC filed amended third-party complaints alleging that Niagara Junction Railway ("NJR") owned and operated on a portion of the site from 1950 until 1974, and that it allowed railway tank cars to contaminate

the site by leaking hazardous waste. The amended third-party complaints further alleged that Conrail is liable as the successor-in-interest to NJR, and that Conrail, therefore, is liable for cost-recovery under CERCLA section 107 and contribution under CERCLA section 113 and New York statutory and common law.

On April 3, 1998, Solvent filed its fifth amended third-party complaint, adding many third-party defendants and in which Solvent added a claim that Conrail was an owner and/or operator on the site after April 1976 (Item 746, ¶¶ 125–26). Solvent alleges that during this period, Conrail caused or contributed to the contamination at the site by allowing railway tank cars to leak hazardous substances while moving or standing on or near the site (*Id.*, ¶ 126).

On April 8, 1998, the court granted Mader's motion to discontinue its action against Conrail, and other third-party defendants, without prejudice (Item 747). Consequently, Conrail's motion for summary judgment against Mader is now moot. As such, the court will not discuss any of Mader's arguments in response to Conrail's motion.

### FACTUAL BACKGROUND

In the early 1970s, eight of the major railroads in the Northeast and Midwest became insolvent and filed for bankruptcy. In response to what it perceived as a rail transportation crisis, Congress enacted the Regional Rail Reorganization Act of 1973 ("Rail Act") and created the United States Railway Association ("USRA"), which it charged with the preparation of a plan to restructure rail service in the region. *Consolidated Rail Corp. v. United States*, 883 F.Supp. 1565, 1569 (Sp.Ct.R.R.R.A.1995).[1] The primary purpose of the Rail Act was the reorganization of railroads in the region into an "economically viable system capable of providing adequate and efficient rail service." 45 U.S.C. § 701(b)(2). The Rail Act called for the creation of Conrail, a private corporation which would operate "a rail system ... adequate to meet the needs and service requirements of this region and of the national rail transportation system." 45 U.S.C.

§ 701(b)(1). The USRA's final system plan ("FSP") designated that certain properties would be transferred to and operated by the newly created Conrail in order to create a financially self-sustaining rail service system. The USRA submitted the FSP to Congress for approval pursuant to section 208(a) of the Rail Act. 45 U.S.C. § 718(a).

Conrail was created by Congress specifically to take title to and operate certain rail properties and assets. It did not choose the properties and assets that it received. The USRA selected the properties and assets, and the transfers were made pursuant to court orders and documents drafted pursuant to such orders. As Judge Wisdom explained in *Penn Central Corp. v. United States*, 862 F.Supp. 437, 446 (Sp.Ct.R.R.R.A.1994) ("*Penn Central II*"):

> These transactions were consummated with an eye toward the future. Congress believed that the future profitability of the rail lines depended upon the degree to which they could be made more efficient. Accordingly, Conrail, as the recipient of the properties, was charged with rehabilitating, improving, and modernizing the rail properties. In exchange, Congress sought to give Conrail and the other post-conveyance railroads a clean slate, free from the financial burdens of their predecessor. This financial *tabula rasa* reflected the "fresh start policy" embodied in the Rail Act.

The Rail Act also created a special court ("Rail Act Court") comprised of three federal judges to administer "all judicial proceedings with respect to the final system plan." 45 U.S.C. § 719(b). This court was "authorized to exercise the powers of a district judge in any judicial district with respect to such proceedings ...." *Id.* Under the Rail Act, the Rail Act Court has original and exclusive jurisdiction over certain issues. 45 U.S.C. § 719(e). Subsection (e)(1) provides in relevant part that the Rail Act Court has original and exclusive jurisdiction, "notwithstanding any other provision of law," over any civil action:

---

1. Special Court, Regional Rail Reorganization Act of 1973.

(A) for injunctive or other relief against the [USRA] from the enforcement, operation, or execution of this chapter or any provision thereof, or from any action taken by the [USRA] pursuant to authority conferred or purportedly conferred under this chapter;

(B) challenging the constitutionality of this chapter or any provision thereof;

(C) challenging the legality of any action of the [USRA], or any failure of the [USRA] to take any action, pursuant to authority conferred or purportedly conferred under this chapter;

(D) to obtain, inspect, copy, or review any document in the possession or control of the [USRA] that would be discoverable in litigation pursuant to section 743(c) of this title;

(E) brought after a conveyance, pursuant to section 743(b) of this title, to set aside or annul such conveyance or to secure in any way the reconveyance of any rail properties so conveyed; or

(F) with respect to continuing reorganization and supplemental transactions, in accordance with section 745 of this title.

Subsection (e)(2) provides that "[t]he original and exclusive jurisdiction of the [Rail Act Court] shall include *any action* ... to interpret, alter, amend, modify, or implement any of the orders entered by such court pursuant to section 743(b) of this title in order to effect the purposes of [the Rail Act] ... or the goals of the final system plan." (emphasis added).

Congress abolished the Rail Act Court effective January 17, 1997; however, Congress transferred the jurisdiction and other functions of the Rail Act Court to the United States District Court for the District of Columbia. 45 U.S.C. § 719(b)(2). Although before January 17, 1997, final orders of the Rail Act court were reviewable only upon petition for a writ of *certiorari* to the United States Supreme Court, as of January 17, 1997, orders or judgments of the U.S. District Court for the District of Columbia in actions where the court is exercising the exclusive jurisdiction of the Rail Act are reviewable in accordance with 28 U.S.C. §§ 1291, 1292, and 1294. 45 U.S.C. § 719(e)(3).

On March 25, 1976, the Rail Act Court issued a conveyance order transferring various properties to Conrail (Item 268, Catania Declaration and Exhibit A). Various properties of NJR were transferred to Conrail pursuant to this conveyance (*Id.*, Catania Declaration, ¶ 4, Exhibits B and C). These conveyances were effective April 1, 1976. The parties dispute the actual extent of the conveyance, both sides relying on the same documents. Solvent contends that pursuant to the Rail Act Court's order, the assets conveyed to Conrail include all rights, title, and interest in NJR's (i) real property (except for two small specified parcels); (ii) rolling stock; (iii) supplies and equipment; (iv) leases; (v) books; (vi) files; (vii) records; (viii) executory contracts; (ix) data processing systems; (x) various intangibles and intellectual property rights; and (xi) special corporate funds and accounts, including funds for payments for contingent liabilities (Item 281, ¶ 6; Item 668, pp. 5–6). Conrail argues that far fewer assets were transferred and that the conveyance documents do not support Solvent's contentions (Item 298, ¶ 6).

In 1982, NJR asserted claims against the United States pursuant to the Rail Act for compensation for its rail related assets conveyed to Conrail (*See* Items 496 and 497, and accompanying exhibits). Conrail has referred to this separate action as the valuation proceedings. On July 7, 1982, the Rail Act Court approved a settlement agreement among the United States, the USRA, and NJR, in which the United States agreed to pay NJR $1,120,600, plus interest (Item 497, ¶¶ 7–8). The Rail Act Court found that the sum was a fair and equitable compromise of NJR's claims and that the net liquidation value, as of April 1, 1976, of its rail properties conveyed to Conrail was $1,120,600 (*Id.*, ¶ 9). On August 3, 1982, the United States paid to NJR $1,827,754 in cash to settle these claims, and the Rail Act Court entered judgment dismissing NJR's suit (*Id.*, ¶¶ 10–11).

Conrail contends that it cannot be held liable as a successor-in-interest to NJR because (1) the Rail Act Court held on August 23, 1994, that Conrail could not be held liable for contamination that pre-existed its April 1,

1976, creation, and (2) Conrail is not a statutory successor-in-interest or liable as a successor under any common law theories of successor liability. Solvent contends that Conrail is liable for pre-conveyance contamination as a matter of law. Solvent asserts that (1) the Rail Act does not provide any immunity from CERCLA liability, (2) CERCLA trumps the Rail Act, (3) the Rail Act Court overreached its authority and erred when it exempted Conrail from CERCLA liability for pre-conveyance contamination, (4) Conrail is the legal successor-in-interest to NJR, as determined by the Interstate Commerce Commission ("ICC") and affirmed by the District of Columbia Circuit Court of Appeals, and (5) Conrail is the successor-in-interest under common law theories of liability.

## DISCUSSION

■ For the reasons stated below, this court finds that it lacks subject matter jurisdiction over the question of whether Conrail may be held liable as a successor-in-interest to NJR for pre-conveyance liability.

### I. The Rail Act Court Cases

The Rail Act Court considered the very question of whether Conrail could be held liable for recovery costs for pre-conveyance contamination of two separate rail yards. *See Penn Central Corp. v. United States,* 814 F.Supp. 1116 (Sp.Ct.R.R.R.A.1993) (*"Penn Central I"*); *Penn Central II,* 862 F.Supp. at 437; *Consolidated Rail Corp. v. U.S.,* 883 F.Supp. 1565 (Sp.Ct.R.R.R.A.1995). In these related actions, the government had filed two separate suits against Penn Central, Conrail, and other parties, one in the Eastern District of Pennsylvania and one in the Northern District of Indiana, for CERCLA cleanup costs. Both rail yards had been transferred from Penn Central to Conrail in 1976 in accordance with a conveyance order of the Rail Act Court. Although Conrail transferred ownership of one of the yards immediately after receiving that property from Penn Central, Conrail continued to operate on both sites well after the transfer. Penn Central filed a suit in the Rail Act Court seeking declaratory and injunctive relief on the question of its own liability for contamination under the conveyance orders. Conrail filed a cross-claim seeking declaratory and injunctive relief on its liability.

The Rail Act Court first determined that because the question of Conrail's liability for pre-conveyance contamination required the interpretation of the Rail Act, the FSP, the Rail Act Court's conveyance order issued pursuant to the FSP, any conveyance documents or deeds executed pursuant to the conveyance order, and the settlement agreement between Penn Central and the government regarding valuation of the transferred assets, the Rail Act Court had exclusive jurisdiction to hear that portion of the case. *Penn Central I,* 814 F.Supp. at 1119–21; *Penn Central II,* 862 F.Supp. at 445–46. In *Penn Central I,* the Rail Act Court explained that

> although not every case relating to the Rail Act will fall within [the Rail Act Court's] exclusive jurisdiction, "those where the critical nature of the determination demands the *consistent* interpretation possible only when review is concentrated in a single court" do fall within its exclusive jurisdiction....
>
> We cannot allow a number, perhaps a large number, of district courts independently to interpret this court's order. Even if the potentially inconsistent results were not a problem, section 209 grants *exclusive* jurisdiction to hear these types of claims.

814 F.Supp. at 1121 (quoting *Consolidated Rail Corp. v. Illinois,* 423 F.Supp. 941 (Sp.Ct.R.R.R.A.1976), *cert. denied,* 429 U.S. 1095, 97 S.Ct. 1111, 51 L.Ed.2d 542 (1977)) (emphasis in original). The Rail Act Court rejected the government's argument that the Rail Act Court lacked jurisdiction because section 113(b) of CERCLA grants exclusive original jurisdiction over all controversies arising under CERCLA to the United States district courts. The court explained that because the claims asserted in the declaratory and injunctive relief action required the court to interpret the FSP, the conveyance order, the instruments executed pursuant to the plan and order, and the settlement agreement, the claims arise under the Rail Act, not CERC-

LA. *Penn Central I,* 814 F.Supp. at 1121. The court acknowledged that the CERCLA claims would still be heard in the district courts before which those claims had been brought.

After considering the parties' substantive arguments and reviewing the relevant documents, the Rail Act Court determined that the language contained in the deeds for the two rail yards, taken together with the fresh start policy embodied in the Rail Act, shielded Conrail from liability from any pre-conveyance contamination. *Penn Central II,* 862 F.Supp. at 463. The court explained that the fresh start policy of the Rail Act, taken alone, is insufficient to ward off potential CERCLA liability. *Id.* at 461–62. The court noted that the Rail Act failed to address the assignment of liability for the cleanup of environmental contamination, and the court concluded that CERCLA, or other environmental damage liability, "simply was of no moment to Congress at that time." *Id.* at 446, 462. The court found that CERCLA trumps "whatever policy permeates the Rail Act." Nevertheless, because the deeds contained language that expressly stated that Conrail would assume no obligation or liability for any pre-conveyance activity, the fresh start policy of the Rail Act tipped the balance in favor of Conrail. Consequently, the court held that Conrail could only be held liable for post-conveyance contamination on the two yards at issue.

Having found that Conrail could not be held liable for any pre-conveyance contamination on those sites, the Rail Act Court rejected Conrail's claims that the dates of the operational history of the sites alone offered a "bright line" method for dividing liability and found that that court was not the proper forum to determine whether pursuant to CERCLA the environmental damage could be allocated in such a manner that Conrail would in fact only be held liable for post-conveyance liability. *Penn Central II,* 862 F.Supp. at 465; *see also Consolidated Rail Corp.,* 883 F.Supp. at 1576–77. The court explained that under CERCLA, if the respective periods of ownership and operation were not an accurate reflection of the degree to which each party was liable for the environmental harm, joint and several liability

would have to be imposed. *Penn Central II,* 862 F.Supp. at 465. The court further explained that in order to determine whether the harm is divisible, a court would have to study extensive evidentiary and testimonial material regarding the degree of contamination, the relative toxicity, and the migratory potential and synergistic capacity of the waste. *Id.* at 467. Such questions clearly implicate CERCLA; therefore they are for a federal district court to consider. The Rail Act Court stated that:

> This Court is the final arbiter of the correct interpretation of the conveyance documents, Rail Act, and FSP. No CERCLA claims will ever be pressed here. We do not conduct conventional trials.... Federal district courts, on the other hand, are well-versed in receiving complicated evidence and testimony. Given that they are the tribunals that will ultimately hear the CERCLA claims themselves, they are better situated to receive the evidence that will affect those determinations.

*Id.* The court agreed that the periods of operation, the fresh start policy, and other equitable considerations should be considered by the district court hearing the CERCLA actions, if only at the contribution stage. *Id.* at 467–68.

More recently, the U.S. District Court for the District of Columbia, exercising the exclusive jurisdiction of the Rail Act, reiterated that it is "the final arbiter of the correct interpretation of conveyance documents," and held that because the question of Conrail's liability as a successor is governed by the Rail Act Court's conveyance order and conveyance documents, the question falls within the District Court for the District of Columbia's exclusive jurisdiction. *Consolidated Rail Corp. v. Pennsylvania Department of General Services,* No–97–RR–01, slip op. at 5–6 (Sp.Ct.R.R.R.A.1997) (Item 621, attachment). The court explained that "if any claim sought to be asserted in [another court] comes within the ambit of this court's exclusive jurisdiction, any adjudication there would be a nullity." *Id.* at 5. The court both cited and relied upon *Penn Central II* and *Consoldiated Rail Corp.* in reaching this holding. Although the underlying dispute in

*Pennsylvania Dept. of General Services* did not involve CERCLA liability, the court's interpretation of its own jurisdiction over claims premised upon successor liability applies to CERCLA cases as well as non-CERCLA cases.[2]

Conrail wants this court to apply the holdings of these Rail Act Court cases to Solvent's claims premised upon successor liability and to grant partial summary judgment in Conrail's favor as a matter of law. Because the Rail Act Court's decisions in the *Penn Central* cases were not based on any particular provisions of the Rail Act or on the fresh start policy alone, but rather were "rooted in the language of the deeds construed with the Rail Act", *Penn Central II*, 862 F.Supp. at 465, this court cannot apply these holdings to the present case. Only the U.S. District Court for the District of Columbia has the jurisdiction to consider Conrail's liability for pre-conveyance contamination under the conveyance documents regarding the transfer of NJR's assets.

## II. *Solvent's Arguments*

Solvent has presented numerous arguments as to why the Rail Act Court exceeded its jurisdiction and that its decision regarding Conrail's pre-conveyance liability was incorrect. Several of these arguments can be dismissed based on the above discussion. Specifically, Solvent argues that (1) because the Rail Act and CERCLA are in direct conflict on this question, CERCLA takes precedence over the Rail Act, and (2) the Rail Act Court's decisions are either wrong or purely advisory. The Rail Act Court and the District Court for the District of Columbia considered and rejected these very arguments in the *Penn Central* cases and in *Pennsylvania Dept. of General Services*. Solvent cannot bring a *de facto* appeal of the

Rail Act Court's prior decisions in this court. As explained above, the Rail Act, as recently amended, provides for appellate review of final orders of the Rail Act Court. This court declines Solvent's invitation to reinterpret these prior cases. For this court to exercise jurisdiction over the question of Conrail's liability for pre-conveyance contamination in this case, it would have to ignore the Rail Act Court's interpretations of its own jurisdiction, and the statutory grant of review authority to the Court of Appeals for the District of Columbia under the Rail Act as amended.

Some of Solvent's arguments deserve brief comment. First Solvent contends that this court, in addition to the District Court for the District of Columbia, has jurisdiction to decide Conrail's successor liability under CERCLA. At oral argument, counsel for Solvent argued that section 719(e) of the Rail Act limits the Rail Act Court's original and exclusive jurisdiction to six very narrow areas, and the successor liability question is not one of those areas. Consequently, Solvent argues that this court has concurrent jurisdiction to consider and decide the successorship question. As noted above, section 719(e)(2) expressly provides for the original and exclusive jurisdiction over any action to interpret any order entered by the Rail Act Court. There is no question that NJR's property and assets were conveyed to Conrail pursuant to Rail Act Court orders. Thus, pursuant to the statute, the District Court for the District of Columbia has original and exclusive jurisdiction over this dispute.

At oral argument, Solvent also argued that the Eastern District of Pennsylvania's decision in *Schweitzer v. Consolidated Rail Corp.*, 65 B.R. 794 (E.D.Pa.1986), suggests that the Rail Act Court's original and exclu-

---

**2.** Solvent contends that the District Court for the District of Columbia "unequivocally distinguished" between the specific facts of that non-CERCLA case and the instances where a counterbalancing statutory scheme is at issue (Item 668, p. 17). Although the court did note the substantive differences in the cases, this analysis did not impact the court's decision regarding successor liability. This part of the court's analysis addressed the question of the allocation of liability. The court was merely explaining why

in the earlier cases the Rail Act Court had declined to consider the merits of the allocation of liability dispute, because that determination depended upon an application of CERCLA, and why the fresh start policy of the Rail Act, and incorporated into the conveyance documents, created a bright line date upon which the liability of Penn Central ended and the liability of Conrail began in the case then before the court. *See Pennsylvania Dept. of General Services*, at 6–7.

sive jurisdiction is not as clear-cut as the statute might make it seem. In *Schweitzer,* the District Court considered whether the Reading Company ("Reading"), one of Conrail's predecessors, could be held liable under the Federal Employers' Liability Act ("FELA") for alleged asbestos-related injuries suffered by former employees of Reading as a result of their employment. The plaintiffs in *Schweitzer* also named Conrail as a defendant; however, the court's decision dealt only with Reading's motion to dismiss plaintiffs' complaints against Reading. Reading argued that under the Bankruptcy Act, general principles of corporate reorganization, the Rail Act, and state law, it could not be held liable for the plaintiffs' injuries. The court rejected each of these arguments.

Careful review of the *Schweitzer* decision reveals that that case is inapposite to the present circumstances. The *Schweitzer* court was concerned primarily with the question of whether Reading could be held liable under FELA. This focus on the reorganized predecessor railroad company involved bankruptcy principles not relevant to the present case. Because many of Reading's arguments suggested that Conrail should be held liable for the plaintiffs' injuries, the court considered Conrail's liability under the theories advanced by Reading. Nevertheless, the court's focus was not on Conrail and the property that was transferred to Conrail. Furthermore, the court discussed the Rail Act, but only with respect to how the Rail Act failed to support Reading's "dual reorganization" argument. *Schweitzer,* 65 B.R. at 799–802. In this portion of its opinion, the court discussed the history and the purpose of the Rail Act and the interplay of the Rail Act with bankruptcy law and principles. The court did not engage in any of the functions specifically reserved for the Rail Act Court. Specifically, the court did not analyze the conveyance orders and documents executed pursuant thereto. Thus, the court did not overstep its jurisdiction, and therefore the case does not support Solvent's argument.

Second, Solvent has argued that Conrail is the statutory successor-in-interest under the Rail Act because two tribunals have examined the issue and so ruled (Item 668, pp. 20–23). Solvent relies on the ICC's decision and the affirmation of the ICC's decision by the Court of Appeals for the District of Columbia in *The Cincinnati, New Orleans & Texas Pacific Railway Company v. Akron, Canton & Youngstown Railroad Company,* 353 I.C.C. 165 (1976), *aff'd, Consolidated Rail Corporation v. Interstate Commerce Commission,* 590 F.2d 937 (D.C.Cir.1978). The ICC concluded that determinations it had made in regulation of the then-solvent predecessor railroads were binding on Conrail because the Rail Act made Conrail a "federally created statutory successor to its predecessor corporations." *The Cincinnati,* 353 I.C.C. at 70. In affirming the decision of the ICC, the Court of Appeals held that "this conclusion flows directly from the legislation creating Conrail, and is not dependent upon the common law doctrine of successor in interest." 590 F.2d at 941. The Court of Appeals' finding was confined to the context of the applicability of ICC decisions to Conrail.

Whether the Rail Act makes Conrail a statutory successor-in-interest within the meaning of CERCLA section 107 has not been addressed by the Rail Act Court, or any other court. Conrail argues that the *Cosolidated Rail Corp. v. ICC* decision must be narrowly construed, confined to its facts, and does not apply to the CERCLA context (Item 297, p. 15). Solvent argues that the ICC and D.C. Circuit's decisions and the Rail Act Court's decisions in the *Penn Central* cases are inconsistent (Item 335, p. 30). According to Solvent, "[t]he Special Court says [Conrail is] not a successor in interest. The D.C. Circuit Court of Appeals says [it is]." Solvent urges this court to follow the D.C. Circuit's holding, arguing that as an appellate court its decision is entitled to more weight than the Rail Act Court's decisions.

As discussed above, in *Penn Central I* and *Penn Central II,* the Rail Act Court held that it has exclusive jurisdiction to determine whether CERCLA liability is proper for the railroad's pre-conveyance activities. In those cases, the Rail Act Court found that under the circumstances, Conrail was not liable for pre-conveyance contamination. The Rail Act Court did not mention the significance of the

D.C. Circuit's decision in *Consolidated Rail Corporation v. ICC* six years earlier and in an completely different context. Although Solvent's argument may have merit, the opportunity to reconcile these opinions cannot rest with this court. The District Court for the District of Columbia has exclusive jurisdiction over the interpretation of the Rail Act, reviewable only by the D.C. Circuit of Appeals and the U.S. Supreme Court. Thus, the District Court for the District of Columbia must determine whether, on the facts of this case, the Rail Act made Conrail a "statutory successor in interest" to the pre-conveyance railroads for CERCLA purposes.

Third, Solvent contends that because CERCLA mandates that agreements to hold a transferee harmless are not enforceable, the central inquiry is not the proper interpretation of the conveyance documents, but rather whether provisions in the conveyance documents that appear to shield Conrail from pre-conveyance liability are enforceable under CERCLA (Item 668, pp. 17–19). Thus, Solvent argues that the essential issues in its claims and Conrail's defenses do not involve any kind of special interpretation of the Rail Act or the FSP, and therefore, this court has jurisdiction. According to Solvent, regardless of how the Rail Act Court, or any other tribunal, interprets the meaning of the conveyance documents, CERCLA prohibits them from being used to transfer owner or operator liability away from a potentially responsible party under section 107 (*Id.*, p. 19). Conrail has not specifically responded to this argument; nevertheless, it has consistently argued that under the *Penn Central* decisions, the Rail Act Court has sole and exclusive jurisdiction to decide whether Conrail is a successor to transferor railroads based upon activities at Superfund sites prior to April 1, 1976 (Item 698, pp. 3–5).

■■■ CERCLA section 107(e)(1) provides that:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from .... any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1). Solvent seems to believe that because the word "conveyance" appears in section 107(e)(1), this provision by itself renders the Rail Act Court's decisions in the *Penn Central* decisions meaningless. The Rail Act Court did not mention CERCLA section 107(e)(1) in its *Penn Central* decisions, so it is impossible to know whether the court considered the significance of that provision. CERCLA section 107(e)(1) limits the protection of hold-harmless clauses in private contracts created pursuant to state law. *See Olin Corp. v. Consolidated Aluminum Corp.*, 807 F.Supp. 1133 (S.D.N.Y.1992). The conveyances of property and assets to Conrail, however, were effectuated by statute, court orders, and conveyance documents, not by simple agreements between typical buyers and sellers. In light of the history of the creation of Conrail and the conveyance of the property and assets of the bankrupt railroads to Conrail, and the Rail Act Court's decisions in *Penn Central*, the Rail Act controls the interpretation of the language of the conveyance orders and documents, including any language that resembles a hold harmless agreement.

## III. The Proper Procedure for Taking These Issues to the District Court for the District of Columbia

Conrail contends that if the court declines to grant summary judgment in Conrail's favor based on the Rail Act Court's *Penn Central* decisions, this court should transfer the matter to the District Court for the District of Columbia pursuant to 28 U.S.C. § 1631 (Item 698, pp. 5–8). Section 1631 provides for transfer of a civil action that has been brought before a court that lacks subject matter jurisdiction to any court before which the action could have been brought. This statute does not mention whether a court can transfer part of an action or certify a specific question when the court lacks jurisdiction over only a part of the case.

In the *Penn Central* cases, the railroads brought a separate action before the Rail Act Court for declaratory and injunctive relief.

Because I am in doubt as to whether I can transfer this separate issue to the District Court for the District of Columbia, the filing of a new action appears to be the most appropriate approach. By bringing the separate action on its own, Conrail will be able to clearly spell out the questions which it believes must be answered.

In the meantime, discovery should proceed in this case because there are many parties and many issues still to be decided.

## CONCLUSION

For the foregoing reasons, this court denies both Conrail's motion for summary judgment (Item 268) and Solvent's cross-motion for summary judgment (Item 277). The District Court for the District of Columbia has exclusive jurisdiction over the question of whether Conrail can be held liable for environmental contamination at the subject site under a theory of successor liability. Conrail should commence a separate action before that court for declaratory and injunctive relief as soon as possible. The parties should keep this court informed about the progress of that litigation.

There appear to be at least three separate questions that should be answered by the District Court for the District of Columbia. The first is whether Conrail is a statutory successor-in-interest to NJR pursuant to the Rail Act. The second is whether Conrail is subject to CERCLA liability for pre-conveyance activities under the FSP, the conveyance order, and any conveyance documents issued pursuant to that order. The third is how CERCLA section 107(e)(1) applies to court orders and conveyance documents executed pursuant to the Rail Act and the Rail Act Court's orders.

So ordered.