**In the Matter of READING COMPANY, Debtor**

**Bky. 71–828.**

United States District Court,
E. D. Pennsylvania.

July 1, 1974.

Howard H. Lewis, Philadelphia, Pa., for trustees.

Lockwood W. Fogg, Jr., William C. Jamouneau, Philadelphia, Pa., for debtor.

James F. Dausch, U.S. Dept. of Justice, Washington, D.C., for U.S. Government.

Gordon P. MacDougall, Washington, D.C., for Com. of Pa.

G. Clark Cummings, New York City, for Mfrs. Hanover Trust Co.

Edward C. Toole, Jr., Philadelphia, Pa., for interventors Committee of Interline Railroads.

David L. Grove and Baldo M. Carnecchia, Jr., Philadelphia, Pa., for Sullivan, Reynolds & Mabie, shareholders in the debtor.

William T. Lake, Washington, D.C., for U. S. Railway Ass'n.

Collister Johnson, Jr., Washington, D. C., for I.C.C.

Leroy D. Touchton, Trenton, N.J., for State of N.J.

Geoffrey N. Zeh, Washington, D.C., for Railway Labor Executives Ass'n.

## MEMORANDUM AND ORDER NO. 650 and DECISION REQUIRED BY THE SECOND SENTENCE OF § 207(b) OF THE REGIONAL RAIL REORGANIZATION ACT OF 1973

DITTER, District Judge.

The Reading Company is one of eight major railroads in the throes of reorganization under Section 77 of the Bankruptcy Act. All are located in the Northeast or Midwest. Recognizing that substantial federal action is required if the service provided by these railroads is to continue, Congress passed the Regional Rail Reorganization Act of 1973. Presently before the court for determination is the question of whether this Act is fair and equitable as it may be applied to Reading.

In essence, the Regional Rail Reorganization Act of 1973, (RRRA), 45 U.S.C. § 701 et seq., calls for the creation of a new railroad to be made up of components that will come from various parts of the bankrupt lines. The network will be assembled in accordance with a plan prepared by the United States Railway Association (USRA), a new, non-profit government corporation created for this

purpose and other duties imposed by RRRA. The rail system will be operated by a for-profit corporation, Consolidated Rail Corporation (Conrail). In return for the properties transferred to Conrail, the bankrupt companies are to receive a mix of guaranteed securities, Conrail stock, and, if necessary, a deficiency judgment against Conrail.

Congress provided a timetable for the adoption of the final system plan which USRA will propose. From the standpoint of those courts having jurisdiction over a railroad in reorganization, the first step was required 120 days after RRRA became effective. At that time, a decision had to be reached by each court as to whether the railroad was reorganizable on an income basis within a reasonable time under Section 77 of the Bankruptcy Act, and if so, whether the public interest would be better served by continuing those reorganization proceedings as contrasted with a reorganization under RRRA. Pursuant to the 120-day requirements, I entered an order in which I concluded that a Section 77 reorganization could not be successfully accomplished for the Reading. The present determination required by RRRA must be entered within 180 days from its adoption. At issue is whether RRRA provides a process that will be fair and equitable as applied to Reading's estate.

RRRA's validity has been questioned on a broad range of constitutional grounds in connection with the Penn Central reorganization, and a three-judge court has sustained the challenge in significant respects: Connecticut General Insurance Corporation v. United States Railway Association, Civil No. 74-189 (E.D.Pa. filed June 25, 1974). Specifically, RRRA was found deficient for two reasons: First, although it prohibits the discontinuance of service and the abandonment of rail lines pending the implementation of the final system plan, there is no provision to repay the owners for losses that will result from unprofitable operations in the meantime. Second, RRRA was found to offend the uniformity requirements of the Consti-

tution as to laws on bankruptcy because it effects a partial repeal of Section 77 in the 17 states which it covers. The court therefore said that Section 304(f), which prohibits abandonments, and that portion of Section 207(b), which provides for the dismissal of Section 77 reorganization proceedings, could not be enforced. In addition, the court enjoined procedures under RRRA for the certification of the final system plan. The effect of the court's order is to halt the acquisition and fitting together of the basic building blocks of the new rail system. Despite the unconstitutional features of RRRA, the 180-day finding must still be made however.

It is Section 207(b) of RRRA which deals with the participation of the reorganization courts in the adoption of the final system plan. In summary, the portion that is pertinent to the present proceedings states:

> Within 180 days from the passage of RRRA, the court shall decide whether or not the bankrupt is to be reorganized by means of transferring some of its rail properties to Conrail pursuant to the provisions of RRRA.

> Because of the strong public interest in the continuance of rail transportation pursuant to USRA's final system plan, each court shall decide that reorganization proceed in accordance with RRRA unless the court

> (1) has found the railroad is reorganizable under Section 77 of the Bankruptcy Act, or

> (2) finds that RRRA does not provide a process which would be fair and equitable to the estate of the railroad in reorganization in which case it shall dismiss the present reorganization proceedings.

The 120-day finding dealt with the first question: is Reading reorganizable on an income basis within a reasonable time under Section 77 of the Bankruptcy Act? At the time that decision was required, May 2, 1974, I concluded it could not be. Nothing has happened in the meantime to make me more optimistic about Reading's pros-

pects. To the contrary, the economic estimates have turned downward in the ensuing two months. Projected carloads were reduced by 5,000 for 1974 and by 40,000 for 1975. These changes resulted primarily from an easing of the energy crisis, continuing restrictions on the burning of coal, and shortages of domestic metallurgical coal used in steel mills. Projected operating expenses, on the other hand, were increased, largely as a result of continued inflation and the removal of wage and price controls. The net result was a reduction in estimated revenue of $800,000 for 1974 and $12 million for 1975. I therefore reaffirm, for the purposes of the present considerations, my prior decision that Reading cannot be reorganized on an income basis within a reasonable time under Section 77.

When the language of Section 207(b) which pertains to the 180-day finding is examined, three things are at once apparent: Congress has expressed a strong public policy that reorganizations should proceed in accordance with a system plan; this interest is paramount unless inclusion of a specific railroad would not be fair and equitable to its estate; and it is the process of the act as applied to the bankrupt that is to be evaluated, not the result.

■ In the sense used in this portion of RRRA, "process" refers to the entire procedure created by Congress. Quite simply, the reorganization courts have been directed to decide if there is something about the application of the Act which on its face is not fair and equitable to the individual railroad.

There are two situations in which a railroad in reorganization should not be required to be subject to RRRA: where the Section 77 proceedings have practically been completed and it is in a position to operate on a profitable basis, or where the bankrupt is in such precarious financial position that it is useless and impossible to continue any longer despite whatever interim assistance might be granted by RRRA.

■ From the evidence presented to me, I conclude that Reading falls into neither of these categories. Therefore, I am unable to find that RRRA does not provide a process which would be fair and equitable to Reading.

Additionally, there are important constitutional questions about RRRA which have been raised in this matter—chief among them being that the bondholders may be deprived of property without due process of law if the final system plan orders a conveyance of Reading's assets to Conrail free and clear of liens. The bondholders fear that the contemplated payment to them in some mix of guaranteed bonds, Conrail stock, and a deficiency judgment against Conrail would have little or no value, except for the guaranteed bonds, because there is no assurance of Conrail's success.

■■ This is a theoretical possibility and I share Judge Fullam's view in *Connecticut General Insurance,* supra, that the just compensation issue was not prematurely raised and should have been decided by the three-judge court. It does not follow that the matter is ripe for determination in the present proceedings. There is a vast disparity between the value of Reading assets that may go to Conrail and those that may be transferred from Penn Central. Thus, the constitutional question of whether there is any assurance that those assets will be paid for is not the same as to both railroads. It may be facially apparent that even if all the authorized, guaranteed bonds, $500 million, were issued to Penn Central, the consideration would be inadequate. The same does not follow so far as Reading is concerned. Until there is some information about the precise valuation of the specific assets that will go to Conrail and the exact mix of the proposed payment, I am unable to say the result will be unconstitutional. Moreover, the point is now moot since certification of the final system plan has been enjoined.

Finally, RRRA provides for a comprehensive series of checks and approvals prior to any transfer to Conrail. All three branches of government become involved. First, USRA must suggest a preliminary system plan which will be

submitted to interested government agencies, the states, the public, and the reorganization courts. Following an opportunity for public hearings, a final system plan will be presented for the consideration of both houses of Congress together with an evaluation by the I.C.C. Unless Congress rejects the plan, it will be submitted to a special court created to pass on issues that will arise in connection with RRRA. This court is empowered to review matters concerning the value of rail properties to be conveyed under the final system plan and the value of the consideration to be received for these properties. RRRA provides ample process. I have no basis on which to find it will not be duly utilized to produce a constitutional result.

Hobbled as it may be by the decision in *Connecticut General Insurance*, supra, RRRA may still be beneficial to Reading by providing interim assistance and a simplified procedure for abandonment of unprofitable service. Furthermore, Reading might be more attractive to a profitable railroad that would be interested in purchase because RRRA provides federal funds for employee protection.

For these reasons, I cannot find RRRA does not provide a process which is fair and equitable to Reading's estate.