Stanley SCHWEITZER

v.

CONSOLIDATED RAIL CORPORATION
and the Reading Company.

Mildred SEIBERT, Individually and as Executrix of the Estate of Paul D. Seibert, Deceased

v.

CONSOLIDATED RAIL CORPORATION
and the Reading Company.

George A. WENTZEL

v.

CONSOLIDATED RAIL CORPORATION
and the Reading Company.

Carl SCHOLING

v.

CONSOLIDATED RAIL CORPORATION
and the Reading Company.

Martin H. SCHOLL, Individually and as Executor of the Estate of Ethel M. Scholl, Deceased

v.

CONSOLIDATED RAIL CORPORATION
and the Reading Company.

Woodrow W. SCHWAMBACK

v.

CONSOLIDATED RAIL CORPORATION
and the Reading Company.

Marilyn L. FRANK, Executrix of the Estate of Russell C. Wennell, Deceased

v.

CONSOLIDATED RAIL CORPORATION
and the Reading Company.

Earl R. FENSTERMACHER

v.

CONSOLIDATED RAIL CORPORATION
and the Reading Company.

Civ. A. Nos. 81–5375, 81–5376, 82–1683 to 82–1685, 82–2467, 82–2999 and 82–4923.

United States District Court,
E.D. Pennsylvania.

Jan. 10, 1984.

Joseph F. Rice, Blatt & Fales, Barnwell, S.C., for plaintiffs.

Howard H. Lewis, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Reading Company.

Michael W. Burns, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for Conrail.

## OPINION

DITTER, District Judge.

On November 23, 1971, the Reading Company filed for reorganization under section 77 of the former Bankruptcy Act, 11 U.S.C. § 205. In the ensuing nine years, considerable efforts were made by the court, the debtor's trustees; and other interested parties in an attempt to develop a plan of reorganization that was equitable to the debtor's creditors and stockholders. This objective was ultimately reached, and on December 23, 1980, I entered Order No. 2004 which consummated the plan of reorganization. Included within this consummation order was the following provision relating to the discharge and release of claims:

> Section 3.03: Subject to the provisions of Section 6.02 below relating to the payment, assumption or satisfaction by the Reorganized Company of certain claims, the Debtor and the Reading Trustees shall, as of the Consummation Date, be discharged and released forever from:
> (a) all obligations, debts, liabilities and claims against the Debtor, whether or not

filed or presented, whether or not approved, acknowledged or allowed in these proceedings, and whether or not provable in bankruptcy, including without limitation taxes in respect of non-bankrupt leased lines and other subsidiaries which are being satisfied pursuant to the Plan and all claims assumed or guaranteed by the Debtor or enforceable against the property of the Debtor; . . .[1]

Subsequent to the consummation date, December 31, 1980, several former employees of Reading brought actions against it and Consolidated Rail Corporation pursuant to the Federal Employer's Liability Act (FELA), 45 U.S.C. § 1 *et seq.,* seeking to recover for asbestos-related injuries resulting from their employment with the defendants. Presently before me are the motions to dismiss of the Reading Company on the ground that section 3.03 of the consummation order bars plaintiffs' rights to maintain their actions, even though the injuries for which compensation is sought did not become manifest until after the reorganization proceedings had been completed.[2] While the resolution of this question is difficult, the motions to dismiss must be granted.

■ The purpose of efforts under section 77 of the former Bankruptcy Act, 11 U.S.C. § 205, is the reorganization of the debtor railroad "by a readjustment of its financial structure in the interest of the debtor and its creditors and security holders." *Van Schaick v. McCarthy,* 116 F.2d 987, 992 (10th Cir.1941). In this regard, one of the goals of the proceedings is the development of a plan of reorganization that is fair and equitable and affords due recognition to the rights of each class of creditors and stockholders. 11 U.S.C. § 205(e)(1). In order to achieve a fair and equitable result, the rights of the creditors and stockholders must be altered or modified in such a way that best serves all interested parties. *Id.* at section 205(b); 5 *Collier on Bankruptcy* (14th ed. 1978) ¶ 77.13[1]. As in the present case, this often means that creditors will be forced to accept less than 100 per cent of the amount owed to them by the debtor and the stockholders must accept stock in a company whose assets have been diminished by payments made to creditors. Obviously, this effort requires a delicate balancing of the competing interests and a willingness on the part of interested parties to make certain accommodations in order to achieve the desired goal.

Once a plan of reorganization has been developed by the debtor's trustees, it is submitted to the court for its approval. In order for the plan to be approved, the court must be satisfied that it complies with all requirements of law, is feasible, and is fair and equitable. 11 U.S.C. § 205(e). I approved the Reading reorganization plan and made the appropriate findings on May 21, 1980. *In re Reading Company,* 24 B.R. 858 (D.C.E.D.Pa.1980). After the approved plan had been accepted by the appropriate number of creditors and shareholders, I issued an opinion and Order No. 1855 on September 25, 1980, confirming the plan. *See* 11 U.S.C. § 205(e). The final step necessary to complete the reorganization was taken on December 23, 1980, when I issued Order No. 2004 which provided for the consummation of the plan on December 31, 1980.

The essence of this consummation order was the dissolution of the debtor company and creation of the reorganized company. Section 2.02 of Order No. 2004 states that

---

1. Section 6.02, entitled "Assumed Obligations" does not pertain to the type of claims that are asserted here. Instead, this section refers to claims "timely-filed" against the debtor which the reorganized company is responsible for. Those claims that are not timely-filed are discharged by operation of Section 3.03.

2. In section 7.03 of the consummation order, I reserved jurisdiction, *inter alia,* to consider any proof of claim against the debtor. Because of this reservation of jurisdiction, these actions have been temporarily assigned to me in order to resolve the motions to dismiss.

"the Reading Trustees shall cause the books and accounts of the Debtor to be closed as of 11:59 P.M., E.S.T., on the Consummation Date. The books and accounts of the Reorganized Company shall be opened as of 12:00 A.M., E.S.T., on the day following the Consummation Date." The corporation that emerged from the reorganization proceedings resembles the old Reading Company in name only. The debtor had already conveyed most of its rail assets to Conrail on April 1, 1976, pursuant to the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701–94 (Supp. III 1973). The reorganized company that exists today operates as a real estate investment company whose railroad activities are limited to its ownership of certain properties, notably Reading terminal in downtown Philadelphia.

■ As previously noted, section 3.03 of the consummation order discharges the debtor as of December 31, 1980, from all obligations, debts, liabilities, and claims, whether or not filed or presented. The purpose of this provision is clear: to provide finality to the reorganization proceedings with regard to the claims asserted against the debtor. The court of appeals for the Sixth Circuit aptly summarized the purpose of a substantially similar provision in another section 77 proceeding.

> The provisions for reorganization could not be realized if the discharge of debtors were not complete and absolute .... [If] courts should relax the provisions of the law and facilitate the assertion of old claims against discharged and reorganized debtors, the policy of the law would be defeated.... [C]reditors would not participate in reorganizations if they could not feel that the plan was final .... [I]t would be unjust and unfair to those who had accepted and acted upon a reorganization plan if the court were thereafter to reopen the plan and change the conditions which constituted the basis of its earlier acceptance.

*Duryee v. Erie Railroad Company*, 175 F.2d 58, 63 (6th Cir.), *cert. denied*, 338 U.S. 861, 70 S.Ct. 103, 94 L.Ed. 527 (1949). I am in complete accord with this reasoning. Recently, Chief Judge Clarkson S. Fisher of the District of New Jersey echoed a similar rationale in holding that two railroad employees were barred from asserting claims against Central Railroad Company of New Jersey and its reorganized company, Central Jersey Industries, for injuries that had not been discovered at the time of consummation. *In re Central Railroad Company of New Jersey*, No. B 67–401 (D.N.J. July 18, 1983). "Allowance of the claims asserted here and those that would likely follow in the future, would have a substantial impact upon the reorganized company. Furthermore, to permit the estate to be reopened each time a new claim is discovered would preclude any finality to the reorganization proceeding." *Id.* at ——. While it may be harsh to those claimants whose injuries did not become manifest until after the debtor's estate was closed, their claims cannot be heard. This result is inescapable due to the need to be consistent with the expectations of the creditors and stockholders who participated in the reorganization.

I have reached this conclusion with full recognition of the significant factual underpinning of these claims. Evidence has been presented which indicates that officials of the old Reading were aware of the existence of asbestos-related claims prior to the consummation order of December 23, 1980. In a letter of June 5, 1980, to its accountant describing the possible liabilities and future debts of the debtor, Reading's legal counsel stated in part:

> Asbestos fibers were used for some time in the construction and repair of steam boilers by debtor. One suit has been filed for damages resulting from exposure to these fibers and news media publicity has indicated that additional claims may be made. Similarly, claims are possible from employees of Debtor who has been exposed to a toxic substance used in insulating material for electric motors which is alleged to be a cause of cancer. No estimate can be made at this time of the

extent of possible liability from these two causes.

(Exhibit B of Plaintiffs' Second Memorandum in Opposition to Defendant's Motion to Dismiss.) In addition, on November 6, 1980, the administrative counsel of Reading accompanied officials of the National Institute of Occupational Safety and Health (NIOSH) on a tour of the Reading facilities where the plaintiffs were generally employed. This tour was part of a NIOSH investigation of asbestos-related complaints which had been received concerning this job site. Plaintiffs contend that Reading should be held accountable for these claims since its officials knew of their injuries or the possibility of their injuries coming into existence prior to the date of the consummation order. Because of this knowledge, plaintiffs argue that Reading should be estopped from disclaiming liability for asbestos-related injuries.

I disagree. As previously explained, the reorganized company resembles the now-defunct debtor in name only. For all practical purposes, the debtor is a dissolved corporation and the present Reading Company is a separate and distinct entity. As of 11:59 P.M. on December 31, 1980, the debtor ceased to exist. From this time forward, the debtor and the reorganized company were discharged from all past, present, or future claims. Under these circumstances, the reorganized company cannot be responsible for the liabilities of a debtor that is no longer in existence. *See* 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7327 (perm. ed. 1983). To the extent plaintiffs allege fraud or misrepresentation by officials of the debtor which occurred prior to the reorganization, this alleged wrongful conduct cannot be imputed to the new Reading. *Frey v. Frankel,* 443 F.2d 1240 (10th Cir.1971).

For the foregoing reasons, the plaintiffs' claims against both the debtor and the reorganized company must be dismissed.