Stanley SCHWEITZER

v.

CONSOLIDATED RAIL CORPORA-TION and the Reading Company.

Mildred SEIBERT, Individually and as Executrix of the Estate of Paul D. Seibert, Deceased

v.

CONSOLIDATED RAIL CORPORA-TION and the Reading Company.

George A. WENTZEL

v.

CONSOLIDATED RAIL CORPORA-TION and the Reading Company.

Carl SCHOLING

v.

CONSOLIDATED RAIL CORPORA-TION and the Reading Company.

Martin H. SCHOLL, Individually and as Executor of the Estate of Ethel M. Scholl, Deceased

v.

CONSOLIDATED RAIL CORPORA-TION and the Reading Company.

Woodrow W. SCHWAMBACK

v.

CONSOLIDATED RAIL CORPORA-TION and the Reading Company.

Marilyn L. FRANK, Executrix of the Estate of Russell C. Wennell Deceased

v.

CONSOLIDATED RAIL CORPORA-TION and the Reading Company.

Earl R. FENSTERMACHER

v.

CONSOLIDATED RAIL CORPORA-

TION and the Reading Company.

Samuel and Edna BARBITTA

v.

CONSOLIDATED RAIL CORPORA-
TION and the Reading Company.

Gary A. and Anna J. COLLINS

v.

CONSOLIDATED RAIL CORPORA-
TION and the Reading Company.

Gerald E. and Judith E. DAVIS

v.

CONSOLIDATED RAIL CORPORA-
TION and the Reading Company.

Bernard F. DUNN

v.

CONSOLIDATED RAIL CORPORA-
TION and the Reading Company.

Noriand S. GOTSHALL, Individually
and as Executrix of Joseph J.
Albert, deceased

v.

CONSOLIDATED RAIL CORPORA-
TION and the Reading Company.

William A. and Ruth HANNUM

v.

CONSOLIDATED RAIL CORPORA-
TION and the Reading Company.

Ruth N. LEDDY, Individually and as
Executrix of the Estate of
Clarence T. Leddy

v.

CONSOLIDATED RAIL CORPORA-
TION and the Reading Company.

Edward R. and Marion E. MARTIN

v.

CONSOLIDATED RAIL CORPORA-
TION and the Reading Company.

Charles and Elsie TERPOILLI

v.

CONSOLIDATED RAIL CORPORA-
TION, and the Reading Company.

Edna M. BISCONTI, Individually and
as Executrix of the Estate of

Frank Bisconti

v.

CONSOLIDATED RAIL CORPORA-
TION and the Reading Company.

Ethel M. COATES, Individually and as
Administratrix of the Estate of
Edward James Coates, Deceased

v.

CONSOLIDATED RAIL CORPORA-
TION and the Reading Company.

Frank and Catherine D'ALICANDRO

v.

CONSOLIDATED RAIL CORPORA-
TION and the Reading Company.

Willis E. and Mary WOOMERT

v.

CONSOLIDATED RAIL CORPORA-
TION and the Reading Company.

Civ. A. Nos. 81–5375, 81–5376, 82–1683 to
82–1685, 82–2467, 82–2999, 82–4923, 84–
2439, 85–2077, 84–2958, 85–2894, 85–
1229, 85–1378, 84–1845, 84–4075, 84–
2830, 86–1513, 85–4643, 86–2334, 86–
1601.

United States District Court,
E.D. Pennsylvania.

Aug. 22, 1986.

796

Joseph F. Rice, James H. Rion, Barnwell, S.C., Frederick W. Nabhan, Allentown, Pa., John Roven, Houston, Tex., Thomas C. Gallagher, Richard Middleton, Savannah, Ga., Joel H. Aronon, Cherry Hill, N.J., Raymond P. Forceno, Charles A. Klein, Paul Sacks, Philadelphia, Pa., for plaintiffs.

Ralph G. Wellington, Margaret S. Woodruff, Bonnie R. MacDougal, Bruce B. Wilson, Donald A. Brinkworth, D. Scott Morgan, Philadelphia, Pa., for Conrail.

Howard H. Lewis, Timothy I. McCann, Robert L. Sachs, Jr., Philadelphia, Pa., for Reading Co.

## MEMORANDUM AND ORDER

DITTER, District Judge.

After years of supervision, litigation, legislation, and negotiation under Section 77 of the Bankruptcy Act and the Rail Reorganization Act, the Reading Company emerged from reorganization proceedings. It no longer operated a railroad as its rail holdings were transferred to the Consolidated Rail Corp. (Conrail) in 1976, through acts of Congress. Its assets consisted principally of real estate holdings and a substantial claim against the government for the railroad properties conveyed to Conrail. Its liabilities were completely restructured, and various types of securities, depending upon priority of obligation, were issued to Reading's creditors. The culmination of this protracted process was the entry of my order 2004, setting December 31, 1980 as

the consummation date and containing a provision discharging Reading and its trustees from all claims which either had been brought or could have been brought against Reading.

Subsequent to the consummation date, several former Reading employees started separate actions against Reading and Consolidated Rail Corp. pursuant to section 1 et seq. of the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq. (F.E.L.A.), seeking to recover for alleged asbestos-related injuries suffered as a result of their employment with defendants. Reading moved to dismiss the complaints, contending that although the plaintiffs' alleged injuries did not become manifest until after the consummation date, the plaintiffs were only exposed to asbestos as Reading employees prior to consummation and, therefore, plaintiffs' claims were discharged.

The motions were consolidated before me for resolution. While I recognized that adherence to Reading's argument could yield a harsh result,[1] I concluded that the principle of finality necessary to effective reorganization would be completely undermined unless plaintiffs' present claims were determined to be discharged. Accordingly, I granted Reading's motions. *Schweitzer v. Consolidated Rail Corp.*, 36 B.R. 469 (E.D.Pa.1984).

The United States Court of Appeals for the Third Circuit reversed, holding that plaintiffs did not have dischargeable claims until after plaintiffs' asbestos-related diseases had become manifest. *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 943–44 (3d Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). The court of appeals, however, did not address all of Reading's arguments in support of affirmance. Instead, the cases were remanded for consideration of matters which I had not reviewed.

Presently before me are these cases and several factually similar ones that were brought after the entry of my order in the *Schweitzer* group. In each of these cases, Reading has filed motions to dismiss, advancing arguments including those left open by the court of appeals.

Although I firmly believed at the time I entered order 2004 that claims such as these could not be pressed against Reading, in the wake of the Third Circuit's *Schweitzer* holding, I must deny Reading's motions to dismiss.

*Transfer Free and Clear of Claims*

Reading first argues that after consummation of its reorganization, the property that was conveyed from the estate to it was immunized from all claims, including those of plaintiffs. Reading relies on section 77(f) of the Bankruptcy Act, 11 U.S.C. § 205(f) (repealed 1978), and sections 3.01(a) and 7.02 of order 2004, which transferred the debtor's property to Reading free and clear of claims and enjoined the prosecution of suits against Reading or its assets. Section 77(f) states that if a plan so provides,

> [T]he property dealt with by the plan, where transferred and conveyed to the debtor or to the other corporation or corporations provided for by the plan, or when retained by the debtor pursuant to the plan, shall be free and clear of all claims of the debtor, its stockholders and creditors, and the debtors shall be discharged from its debts and liabilities.

11 U.S.C. § 205(f) (repealed 1978).

In *Schweitzer,* the Third Circuit recognized that a cause of action in tort would be a "claim" pursuant to section 77 and that if plaintiffs' causes of action in tort existed prior to the consummation date, they would have been discharged. 758 F.2d at 941. The court concluded, however, that a cause of action under the F.E.L.A. does not exist until the alleged injury manifests itself. *Id.* at 942. Since plaintiffs alleged in their complaints that their injuries did not become manifest until after

---

**1.** Although my order precluded plaintiffs from recovering against Reading, they were not entirely foreclosed from seeking damages for their alleged injuries. Instead, the plaintiffs were left with claims against the manufacturers of any asbestos products that were present in the workplace.

consummation, it could not be held on a motion to dismiss that plaintiffs' claims were discharged. *Id.* at 942–43.

■ While Reading argues that the Third Circuit did not address whether this court had the power to transfer the debtor's property free and clear, it is apparent that section 77(f) provides the basis for a reorganization court to both discharge and transfer. The power with respect to each function is the power to affect "claims." As Conrail observes, there is no indication either in the statute or the legislative history that "claim" is to have a broader meaning in the context of the conveyance of property than it has in the context of discharge.[2] Therefore, the *Schweitzer* court's definition of "claim" for discharge purposes also controls for purposes of the power to transfer. Because the Third Circuit held that I lacked the power to discharge these particular potential claims, it must follow that I lacked the power to transfer property free and clear of them.

### Liability of a Reorganized Company for the Non-discharged Obligations of the Debtor

■ Conrail and plaintiffs argue that under general principles of corporate reorganization, claims stemming from the debtor's conduct which were not discharged by the plan and order of consummation are properly assertable against the reorganized entity. Reading, of course, takes issue with this proposition.

Surprisingly, there is very little express authority on point. The paucity of decisions to a great extent flows from the fact that courts historically have strained to equate the definition of "claims" and hence "discharge" to cover all possible liability of the debtor.[3] *Cf.* 6A J. Moore & L. King,

*Collier on Bankruptcy* ¶ 11.18 (14th ed. 1977) (discussing § 228 of the former Bankruptcy Act, which was recast from former § 77B(h)). Therefore, with the exception of cases discussing classes of claims that have been statutorily excepted from discharge, neither the parties nor I have been able to find a case squarely deciding whether non-discharged claims of the debtor can be asserted against the reorganized entity.

Although one of the prime objectives in reorganization is to make certain the liabilities of the debtor are only those obligations specified in the plan, the means for achieving this objective is provided by discharge. To the extent discharge is not available to bar a particular claim, the reorganized company is provided no relief by section 77, and the non-discharged claims against the debtor are assertable against it.

This conclusion is fundamental and implicit in a number of decisions stressing the importance of broad discharge powers, where the courts noted that the effect of not providing a discharge would be the allowance of claims against the reorganized company. For example, in *In re Erie Lackawanna Railway Co.*, No. B72–2838 (N.D.Ohio 1985), the reorganization court noted that "the complete and absolute discharge of the Debtor was the keystone to the credibility of the Bankruptcy Act which prompted the debtor, its creditors and security holders to accept material and detrimental changes in position to consummate a plan of reorganization. To conclude otherwise, would have forever destroyed the full faith and credit of the Act by decimating the incentive of certainty and finality upon which debtors, their creditors and security holders of necessity were required to rely...." *Id.*, slip op. at 6–7.

---

**2.** The *Schweitzer* panel cited with approval the Fifth Circuit's decision in *In re Mooney Aircraft, Inc.*, 730 F.2d 367 (5th Cir.1984). *See Schweitzer,* 758 F.2d at 943 (citing 730 F.2d 367 (5th Cir.1984)). In *Mooney,* the Fifth Circuit held that a bankruptcy court did not have jurisdiction to enjoin a personal injury action against the successor to a purchaser of the debtor's assets. The court rejected the contention that the bankruptcy court had the power to transfer the property free and clear of claims that did not exist at the time of consummation. 730 F.2d at 375.

**3.** In this case, the court of appeals took just the opposite approach, giving the word "claims" a narrow definition.

Similarly in *In re Munson S.S. Lines,* 80 F.2d 859 (2d Cir.1936), *rev'd on other grnds,* 299 U.S. 77, 57 S.Ct. 90, 81 L.Ed. 49 (1936), the Second Circuit stressed the breadth of the discharge power under section 77B of the former Bankruptcy Act, recognizing that the practical effect of not discharging a debtor of certain claims would be to saddle the reorganized company with those claims. *Id.* at 860. This same principle is implicit in the discussion of section 228 of the former Act contained in a leading treatise:

> [A] sweeping inclusion [of all outstanding liabilities, debts, and claims] is necessary so that it may be possible to determine whether a plan is fair, equitable and feasible and whether the rehabilitated company may 'weather the financial storm.' It is also necessary if a thorough-going reorganization is to be effected so that the enterprise can be launched on a more successful career. The confirmed plan ... binds everyone, and consistent with the discharge must terminate all manner of claims or interests, else the reorganized business will be hampered at the outset with holdover obligations which will defeat the very purpose of the case.

6A J. Moore & L. King, *Collier on Bankruptcy* ¶ 11.18, at 302 (14th ed. 1977).

If the termination of reorganization proceedings of itself barred non-discharged claims from being asserted against the reorganized company, there would be no need for concern about the scope of discharge, the possibility of holdover obligations, or the effect of non-discharged claims on the career of the reorganized enterprise. Such an interpretation of the reorganization statutes would transform the discharge provision from a position of prominence to that of mere surplusage. If, by the mere fact of reorganization and without reference to discharge, the reorganized company were freed of all claims other than those specified in the plan, there would not be a need to define broadly the terms, "liabilities, debts, claims, and discharge."

It may seem anomalous to rely on cases which stress the importance of relieving the reorganized entity of obligations stemming from the debtor's conduct to reach a conclusion which will allow the imposition of liability on the reorganized company. However, these cases base their strength to relieve the reorganized entity on the discharge power, and the Third Circuit has held that, accepting the allegations in the complaints, plaintiffs' claims here have not been discharged.

*Dual Reorganization*

Reading argues alternatively that even if non-discharged claims against a debtor may be asserted against the reorganized company, a reorganization under the Rail Reorganization Act is distinct from non-rail reorganizations in that a Rail Act reorganization yields two reorganized entities. It contends that Conrail is the reorganized entity with respect to the debtor's rail operations and that Reading is the reorganized entity with respect to the debtor's non-rail operations. Under this theory, liability for plaintiffs' asbestos-related claims would be Conrail's responsibility because these claims stem from the debtor's rail operations and conversely, Reading would have no liability because it received only non-rail assets. It asserts that with the exception of those obligations set forth in the plan of reorganization, only the non-discharged, non-rail liabilities of the debtor are passed on to the non-rail reorganized entity such as itself.

Conrail rejoins by likening itself to a mere purchaser of assets, which, under normal reorganization principles, does not divest the reorganized entity of responsibility for the debtor's conduct, even if the responsibility flowed from the debtor's use of the property that was conveyed to the purchaser. It argues that, with the Rail Act, Congress did not intend to alter fundamental principles of reorganization law to create two reorganized entities. Therefore, Conrail argues, its creation does not result in the withdrawal of Reading's potential liability.

Between 1967 and 1973, eight Northeastern railroads, including Reading and the colossus Penn Central, filed petitions in bankruptcy.[4] In response to the threat these filings and their underlying causes posed to continued rail service in the Northeast, Congress passed the Regional Rail Reorganization Act of 1973 ("Rail Act"), Pub.L. No. 93–236, 87 Stat. 985 (1974) (codified as amended at 45 U.S.C. §§ 701–794). Among other things, the Rail Act called for the creation of the United States Railway Association (USRA) and Conrail. One of the USRA's functions was to prepare a Final System Plan, providing a basis for reorganizing rail service in the Northeast and Midwest. 45 U.S.C. § 716. The plan was to designate the properties that were to be conveyed from the bankrupt rail carriers to Conrail, a government-supported but privately-owned corporation. Conrail would operate rail services on the transferred properties. *Id.* In exchange for their properties, the bankrupt rail carriers were to receive Conrail stock and securities. *Id. See generally* Perritt, *Ask and Ye Shall Receive: The Legislative Response to the Northeast Rail Crisis,* 28 Vill.L.Rev. 271, 300 (1983).

The Rail Act regulated the transfer of Reading's properties to Conrail. In order to permit a railroad to reorganize under the Rail Act, the reorganization court had to make certain findings. Under Section 207(b) of the Rail Act, 45 U.S.C. § 717(b), I concluded that Reading could not be reorganized as a railroad on an income basis in a reasonable time, and that the public interest would be served better by reorganizing Reading under the Rail Act. *In re Reading Co.,* 378 F.Supp. 474 (E.D.Pa.), *aff'd,* 384 F.Supp. 895 (Sp.Ct.1974). I then determined that Reading should be reorganized by transferring some of its rail properties to Conrail and found that the Rail Act provided a process which would be fair and equitable to the estate. *In re Reading Co.,* 378 F.Supp. 481 (E.D.Pa.), *aff'd,* 384 F.Supp. 895 (Sp.Ct.1974). On April 1, 1976, Reading's assets were transferred to Conrail.

Reading argues that this process constituted a compelled reorganization of rail operations into Conrail, and, therefore, Conrail's analogy to a sale of assets is inappropriate. While the exchange of assets from Reading to Conrail may have been compelled, it stretches the imagination to dub Reading an unwilling divorcee. Reading sought the protection of section 77 in 1971 and the benefits of the Rail Act thereafter. It was, after all, the Rail Act which allowed Reading to reorganize. As previously mentioned, I found as a predicate to allowing reorganization under the Rail Act that Reading could not be reorganized profitably as a railroad. The Rail Act provided Reading with a buyer for its rail properties and thus gave it a means to emerge from bankruptcy proceedings and engage in other activity.

Moreover, to focus on whether or not the exchange was compelled is to obscure the true issue—whether Congress intended in section 77 and the Rail Act to pass the debtor's non-discharged rail obligations to Conrail. Reviewing the legislative history and structure of the Rail Act, I believe Congress did not intend to alter a fundamental concept of reorganization law to relieve a debtor's successor and saddle a wholly-new entity that was created by Congress to serve the public interest with non-discharged claims against the debtor.

First, as I have already observed, it is a fundamental principle of reorganization law that the non-discharged claims of the debtor may be properly asserted against the company which emerges as the reorganized debtor. Implicit in this fundamental principle is the concept that although the assets of the debtor may be distributed to numerous entities, the organic nature of the debtor would be reorganized into a

---

4. In addition to Reading and Penn Central, the Central of New Jersey, the Boston & Maine, the Lehigh Valley, the Lehigh and Hudson, the Erie Lackawanna and the Ann Arbor succumbed to bankruptcy. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 108–09 n. 3, 95 S.Ct. 335, 341–42 n. 3, 42 L.Ed.2d 320 (1973).

single entity.[5] While in the Rail Act Congress devised "imaginative and innovative solutions in an endeavor to avoid [a] national disaster ...," *In re Penn Central Transportation Co.*, 384 F.Supp. 895, 904, (Sp.Ct.1974), one would certainly expect that if Congress intended to alter this fundamental principle of reorganization law to create two reorganized entities, such an intention would be manifest either in the language or legislative history of the Rail Act. However, a review of the structure and legislative history of the Act finds no suggestion of such an intent.

Moreover, the purpose behind the Act is at odds with Reading's contention. It is plain that the overriding purpose of the Rail Act was to revive the severely distressed northeastern rail system to assure adequate rail service in that region. *See generally In Re Penn Central Transportation Co.*, 384 F.Supp. at 902–03. The means to accomplish this purpose was to create a new, viable system from the bits and pieces of the old. As Reading itself acknowledges, the purpose of the Act was not to enable debtor railroads to avoid liquidation in order to carry on non-rail related business, but to separate them from their rail assets and transfer those assets to Conrail. *Cf. In re Lehigh Valley Railroad Co.*, 558 F.2d 137, 147 (3d Cir.1977) (where rail assets have been transferred from the debtor to Conrail, the public no longer has an interest in the estate, and the basic objective of the reorganization is the protection of the rights of creditors).

Reading argues that the result it advocates would have been obtained if there had been no Rail Act. It notes that the court had found that it was incapable of an income-based reorganization and argues, therefore, that had there been no Rail Act it would have been liquidated, and plaintiffs here would have had no remedy against it. This argument, however, ignores reality—the Rail Act exists, it exists to foster rail transportation, and it incidentally breathed new life into Reading and allowed Reading to survive.

Not only the legislative history, but the structure of the Rail Act suggests that Congress did not intend all nondischarged rail obligations to be borne by Conrail and not Reading. Reading's supplemental memorandum points to several Rail Act provisions assigning responsibility to Conrail for certain post-conveyance rail obligations that had their genesis prior to conveyance.[6] However, these provisions cannot be read to sweep so broadly as to evince congressional intent to impose on Conrail the responsibility for all rail obligations which accrued after conveyance but which stemmed from the debtor's pre-conveyance activities. Instead, the provisions reveal that Congress intended to burden Conrail with only limited obligations that originated with the debtor's rail activities. By announcing an expansive and indelicate rule imposing responsibility on Conrail for all non-discharged rail obli-

---

**5.** An outside observer might perceive as the debtor's successor an entity which received a substantial portion of the debtor's assets. However, a corporation is a creature of statute, deriving its essence from its articles of incorporation and by-laws. Where the debtor's articles of incorporation are passed to an entity through reorganization, it is this entity which is the reorganized company.

**6.** For example, Reading relies on 45 U.S.C. § 743(b)(3)(A)(ii) dealing with the conveyance of rolling stock to Conrail. A conveyance of rolling stock may be effected if Conrail "assumes all of the obligations under any applicable conditional sale agreement, equipment trust agreement, or lease with respect to such rolling stock (*including any obligations which accrued prior to the date on which such properties are*

*conveyed* )," and the conveyance is made subject to the obligations. *Id.* (emphasis added). Reading argues that Conrail received most of its rolling stock burdened with the terms and conditions negotiated by the railroads in reorganization. *See also* 45 U.S.C. § 743(b)(2) (rail properties conveyed to Conrail are burdened by leases and agreements previously entered into between prior operator and state, local, or regional transportation authority).

Reading also points to a Title of the Rail Act that was effective at the time of conveyance but has since been repealed. *See* 45 U.S.C. § 771 *et. seq.* (repealed 1981) (requiring Conrail to pay certain benefits to workers laid off after conveyance and to honor certain labor agreements negotiated by the debtor prior to conveyance).

gations, I would wreak havoc on the precise delegation of responsibility that Congress fashioned.

Reading places heavy reliance on two decisions from the Sixth Circuit. However, I do not find either of these decisions to be supportive of Reading's dual reorganization argument. In the first case, *In re Erie Lackawanna Railway Co.*, 548 F.2d 621 (6th Cir.1977), non-contract, white-collar employees who had retired prior to conveyance of the debtor's rail assets, sought an order requiring the trustees to continue to pay premiums on their group life insurance after the conveyance date. The employees argued before the reorganization court that post-conveyance premiums constituted administrative expenses of the debtor.[7] The reorganization court rejected this contention and the court of appeals affirmed, holding that the payments ceased to be administrative expenses when the debtor transferred its rail assets to Conrail. *Id.* at 631.

The case cannot be read as announcing or even supporting the principle that Reading advocates. Instead, the case merely holds that certain post-conveyance claims could not be afforded the priority of administrative status. Contrary to Reading's assertion, the Sixth Circuit did not impose the responsibility for post-conveyance funding on Conrail. In fact, the Sixth Circuit observed that during the pendency of the litigation before the reorganization court, the Special Rail Court refused a petition by the trustees seeking to have the policy and its obligations conveyed to Conrail. The Sixth Circuit quoted Judge Friendly, writing for the special court:

'[W]e are unpersuaded that Congress intended to saddle Conrail with an obligation to maintain group life insurance for the benefit of people who had never worked for it or even to incur the onus of termination.'

*Id.* at 623.[8]

The second Sixth Circuit decision cited by Reading, *In re Erie Lackawanna Railway Co.*, 558 F.2d 339 (6th Cir.1977), similarly cannot be read as laying down a rule that Conrail must assume pre-conveyance rail-related obligations that accrue after conveyance. *Erie Lackawanna* focuses on a narrow question arising under section 211(h), requiring the trustees and Conrail to attempt to negotiate an agency agreement for Conrail's processing of post-conveyance accounts receivable and pre-conveyance accounts payable. At issue was whether Conrail was to be compensated by the estate for the services performed if an agency were established. The Sixth Circuit noted that the legislative history to section 211 revealed that Congress did not intend Conrail to be compensated by the estate for this function and affirmed the order of the reorganization court, which had refused a petition that would have provided compensation to Conrail. The case focused solely on the intent behind a specific provision of the Act and not on a congressional design to impose on Conrail a generalized responsibility for rail obligations that accrue after conveyance but stem from preconveyance activities.

Faced with the structure of the Rail Act, the Act's avowed purpose of fostering northeastern rail service, and the absence of legislative history suggesting a fundamental change in reorganization law, I must conclude that Congress did not intend to impose on Conrail the primary responsibility for non-discharged F.E.L.A. claims which arose from the debtor's pre-conveyance conduct.

---

**7.** The retirees sought to have their claims classified as administrative expenses so that funds under § 211(h) would be available to fund the policy.

**8.** After the Sixth Circuit rendered its decision, Congress amended the Rail Act in an attempt to provide greater protection to non-contract employees by declaring certain premiums and insurance benefits administrative claims for purposes of § 721(h)(4)(A)(iii). *See* Pub.L. No. 94–555, 90 Stat. 2620 (codified at 45 U.S.C. 743(b)(6)(B)). Although this amendment may have changed the result of the *Erie* decision by deeming the premiums administrative expenses, it does not make *Erie* supportive of Reading's position and does not, itself, support Reading.

*Distinct Entity under State Law*

Reading, the reorganized, next suggests that, as a matter of state law, it is a wholly distinct entity from Reading, the debtor. This argument fails to withstand scrutiny.

Under Reading's plan of reorganization, the corporation's capital was restructured and its articles of incorporation and by-laws were amended. However, as Conrail correctly observes, Reading's corporate identity continues. Section III of the Plan of Reorganization, pertaining to the description of the reorganized company, provides in part: "For purposes of convenience, simplicity and economy in carrying out the provisions of the Plan and to provide for continuity in the operations of the Debtor, the Reading Company shall continue to exist as the Reorganized Company with appropriate amendments to its Articles of Incorporation and By-Laws."

■ The amendment of corporate articles and by-laws neither created a new corporate entity nor absolved the corporation of pre-amendment liabilities. As one leading commentator has noted:

> Where the charter of a corporation is merely amended, either by a special act, or under a general law, there is no change in the identity of the corporate body—no dissolution of one corporation and creation of another—and the corporation, under the amended charter, is liable for all debts contracted by it before amendment. The same is true when the charter of a corporation is newly extended or revived, or the corporation reorganized, without creating a new corporation.... Thus, where a company is merely reincorporated, the new company is liable for the debts of the old....

15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7329 (1983). *Cf. In re Penn Central Securities Litigation*, 335 F.Supp. 1026, 1033 (E.D.Pa.1971) (corporation's decision to relinquish its 1846 charter and file articles of incorporation under amended state law did not affect continuous corporate existence of the company). Therefore Reading cannot be freed from its undischarged claims by being considered a new legal entity.[9]

*Successor Liability*

Reading next argues that under principles of successor liability analogous to the product-line rule, Conrail as current operator of the instrumentalities which injured plaintiffs should bear responsibility for plaintiffs' claims. I reject this argument because I believe an existing, viable concern cannot avoid liability for its conduct by virtue of a transfer of the instrumentalities to another entity.

The purpose of the product-line rule of successor liability was not to relieve sellers of liability once they discarded manufacturing divisions but to provide remedies for tort victims where it was equitable to do so because a successor stood in the shoes of a seller who had become unavailable. When a seller continues to be viable, the tort victim has not been deprived of a remedy and there is no need to impose successor liability on another corporation. *See* Roe, *Merger's, Acquisition and Tort: A Comment on the Problem of Successor Corporate*, 70 Va.L.Rev. 1559, 150 (1984).

The product-line rule was first announced by the California Supreme Court in *Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). There, the court justified an expansion of prior succes-

9. Language in my original decision in *Schweitzer* may seem to dictate the contrary conclusion. There, I noted that

> the reoganized company resembles the now-defunct debtor in name only. For all practical purposes, the debtor is a dissolved corporation and the present Reading Company is a separate and distinct entity. As of 11:59 p.m. on December 31, 1980, the debtor ceased to exist.

*Schweitzer*, 36 B.R. at 473. It is important to stress that this language was prefaced by the phrase, "For all practical purposes." The practicalities upon which this language and the entirety of the opinion turned were that, for all possible claimants whose claims were not covered by the plan or federal statute, the reorganized company was discharged from responsibility. However, these practical underpinnings were swept away by the court of appeals' treatment of the discharge issue.

sor liability principles on the basis that its expansion would further the policy behind strict liability—"the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them." *Id.* 136 Cal.Rptr. at 579–80, 560 P.2d at 8–9. As one of the predicates to imposing successor liability on the purchaser of the manufacturer's assets, the *Ray* court found the "virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business...." *Id.* 136 Cal.Rptr. at 580, 560 P.2d at 9.

Other courts have stressed the requirement that plaintiffs' claims be barred against the actual manufacturer prior to allowing liability against a successor. For example, in *Gee v. Tenneco, Inc.*, 615 F.2d 857 (9th Cir.1980), the Ninth Circuit held that a corporation's sale of a division did not relieve it from liabilities for injuries caused by products the division had manufactured prior to the division's sale. The court of appeals stated,

> We are aware of no rule of law which allows a corporate entity to evade liability for its tortious conduct merely by selling the instrumentality which is alleged to have caused the injury, and none

has been cited to us in this appeal. It is the general rule that where a corporatin is not dissolved followng a sale of assets or a reorganization, it remains liable for debts and liabilities incurred by it, unless it is otherwise agreed between the corporation and its creditors.

*Id.* at 862. In *Hall v. Armstrong Cork, Inc.*, 692 P.2d 787 (Wash.1984), the Supreme Court of Washington echoed a similar rationale:

> The policy justifications for our adoption of the product line rule require the transfer of substantially all the predecessor's assets to the successor corporation as a prerequisite to imposing liability on the successor.... [I]n keeping with the social policies underlying strict product liability, the product line rule is one of necessity. Absent such a rule, the injured plaintiff is left without meaningful remedy.... When, as here, there has been no complete transfer of assets, the element of necessity is not present, as the plaintiff may look to the original manufacturer....

*Id.* at 791

The requirement of necessity is at least implicit in the leading successor liability discussion under both Pennsylvania and New Jersey law.[10] In *Ramirez v. Amsted*

---

**10.** *But cf. Amader v. Pittsburgh Corning Corp.*, 546 F.Supp. 1033 (E.D.Pa.1982). *Amader* was a products liability action alleging exposure to Unibestos, a line of asbestos pipe insulation products originally manufactured by UNARCO. Judge Troutman issued an *in limine* ruling, allowing plaintiff to offer evidence against Pittsburgh Corning Corp., the purchaser of the Unibestos Line from UNARCO, despite the fact that UNARCO continued to exist. During the pendency of the *Amader* action, UNARCO was the subject of reorganization proceedings. Judge Troutman, however, did not premise his ruling on the present unavailability to bring suit against UNARCO due to the automatic stay provision of the bankruptcy law, but rather asserted that a successor corporation could be held liable even if it did not purchase all or substantially all of the selling corporation's assets and the selling corporation was still available for suit. *Id.* at 1036.

The Ninth Circuit, affirming an award of summary judgment and applying California law, held that Pittsburgh Corning could not be held liable as a successor to UNARCO. *Kline v. Johns-*

*Manville Corp.*, 745 F.2d 1217 (9th Cir.1984). In doing so, the court reaffirmed the prerequisite that plaintiff lack an effective remedy against the original tortfeasor. *Id.* at 1219.

With all due respect to Judge Troutman, I believe the successor should not be pursued until it is determined that the actual tortfeasor is unavailable to provide redress. One commentator has noted that the competing tensions in fashioning a rule of successor liability are compensating plaintiffs as if the damage-causing business had not terminated and preventing a reduction of the transferability of firms or their assets. *See* Roe, *supra*, at 1161–62. Where the actual tortfeasor is still available for suit, the first policy is not implicated. Where no compensation policy is involved, the issue is simply which of two firms should bear the liability for past conduct, the actual tortfeasor or a purchaser of assets. In this situation, the transferability of assets is best furthered by certainty in application of the rule of law, and it is my belief that certainty is promoted by leaving the actual tortfeasor responsible for its product or

*Industries, Inc.,* 86 N.J. 332, 431 A.2d 811 (1981), the New Jersey Supreme Court adopted the product-line rule, stressing that the traditional approaches to successor liability were "inconsistent with developing principles of strict products liability and *unresponsive to the problems of recovery that may confront an injured product user.*" 431 A.2d at 816 (emphasis added). The Pennsylvania Superior Court adopted the product-line rule in *Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106 (1981), relying almost exclusively on *Ray* and *Ramirez,* which as I have noted, were premised on the unavailability of a remedy against the actual manufacturer of the allegedly defective product.

■ Reading has not cited a case where principles of successor liability have withdrawn liability against the existing, original tortfeasor and imposed it on another entity which presently controls the instrumentality which allegedly caused plaintiff's injury. Furthermore, Reading has not cited a case where a product-line type of rule has been applied in a context other than strict products liability. Leading decisions embracing the product-line rule have emphasized that one of the reasons for adopting the rule is to be consistent with principles of strict liability. *See, e.g., Ray,* 560 P.2d at 8–9; *Dawejko,* 434 A.2d at 109, 111; *Ramirez,* 431 A.2d at 811. Where liability is not strict but predicated upon negligence, such as in an F.E.L.A. action, *Stone v. New York, Chicago & St. Louis Railroad Co.,* 344 U.S. 407, 409, 73 S.Ct. 358, 359, 97 L.Ed. 441 (1953), this rationale does not apply. Therefore, it would seem particularly inappropriate to stretch existing successor liability precedent in two directions to exonerate an allegedly culpable party and impose negligence liability on another entity simply by virtue of the latter's acquisition of the instrumentalities with which the former was allegedly negligent.

*Reading not a Proper F.E.L.A. Defendant*

■ Finally, Reading argues that it cannot be held liable to plaintiffs under the F.E.L.A., because plaintiffs did not suffer injury while employed by a common carrier by railroad. The F.E.L.A. provides in pertinent part as follows:

Every common carrier by railroad while engaging in commerce ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or part from the negligence of any of the officers, agents, or employees of such carrier ... for such injury or death resulting in whole or part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. In *Schweitzer,* the Third Circuit rejected the notion that mere exposure to asbestos, without manifestation of injury, was sufficient to give rise to a cause of action under the F.E.L.A. *See* 758 F.2d at 942. The court expressly held that "as a matter of federal law, F.E.L.A. actions for asbestos-related injury do not exist before manifestation of injury." 758 F.2d at 942. According to the complaint, plaintiffs' injuries did not become manifest until after the effective date of the consummation order, December 31, 1980. Reading ceased to be a common carrier by railroad when its rail assets were transferred to Conrail in 1976. Reading therefore argues that, because plaintiffs alleged that they did not have compensable injuries until after Reading went out of the rail business, plaintiffs cannot have causes of action against it.[11]

While this argument has some appeal due to its logical precision, it contravenes

---

conduct unless there has been an agreement to the contrary.

**11.** One could also argue that because the statute only imposes liability on a common carrier by railroad, an entity that ceased rail operations prior to manifest injury or trial could not be held liable. This argument, however, fails to give due accord to the broad sweep of the F.E.L.A. *See* discussion *infra.*

the spirit of the Supreme Court's decision in *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). In *Urie*, the Supreme Court held that for statute of limitations purposes, a cause of action under the F.E.L.A. does not arise until an injury manifests itself. The Court also held that the Act covers occupational diseases as well as accidental injuries. *Id.* at 181, 69 S.Ct. at 1030. In reaching the latter conclusion, the Court spoke generally about the F.E.L.A.:

> The language is as broad as could be framed.... On its face, every injury suffered by any employee while employed by reason of the carrier's negligence was made compensable. The wording was not restrictive as to the employees covered; the cause of injury, except that it must constitute negligence attributable to the carrier; or the particular kind of injury resulting.
>
> To read into this all inclusive wording a restriction as to the kinds of employees covered, the degree of negligence required, or the particular sorts of harms inflicted, would be contradictory to the wording, the remedial and humanitarian purpose and the constant and established course of liberal construction of the Act followed by this Court.

*Id.* at 181–82, 69 S.Ct. at 1030 (footnote omitted).

Reading's construction would preclude not only these claims but also the claims of plaintiffs whose occupational injuries did not become manifest until after they had left the employ of the railroad, even if that railroad continued to operate rail lines. Such a construction runs afoul of the Court's general treatment of F.E.L.A.'s scope. More importantly, it is at odds with more specific reasoning in the Court's opinion. In *Urie*, defendant argued that each intake of silica dust constituted a fresh cause of action, and thus plaintiff could only recover for injuries sustained through exposure to dust which was inhaled within the limitations period. *Id.* at 170, 69 S.Ct. at 1024. The Court rejected this argument, noting that one of the effects of such a rule

would have been to bar plaintiff had he left the railroad outside the limitations period. *Id.* Implicit in this observation is the Court's belief that an employer-employee relationship is not necessary at the time of manifestation. If this is true, then it is also true that the employer need not be a common carrier by railroad at the time of the manifestation of injury in order for a cause of action to lie under the F.E.L.A.

The Supreme Court noted that at the time the F.E.L.A. was enacted Congress was focusing on injuries and death resulting from accidents. *Id.* at 181, 69 S.Ct. at 1030. The Court continued, however, by observing that accidental injuries were not the only injuries likely to occur, "[a]nd nothing in either the language or the legislative history discloses expressly any intent to exclude from the Act's coverage any injury resulting 'in whole or in part from the negligence of the carrier.'" *Id.* In concluding its discussion of the F.E.L.A., the Court stated:

> [W]hen the employer's negligence impairs or destroys an employee's health by requiring him to work under conditions likely to bring about such harmful consequences, the injury to the employee is just as great when it follows, often inevitably, from a carrier's negligent course pursued over an extended period of time as when it comes with the suddenness of lightning.... We do not think the mere difference in the time required for different sets of negligence to take effect and disclose their harmful, disabling consequences would justify excluding the one type of injury from the Act's coverage or that such an exclusion would be consistent with its language, purposes or unvarying standards of construction.

*Id.* at 187, 69 S.Ct. at 1033. Given the Supreme Court's expression of the purpose of the F.E.L.A. and the fact that the Act covers creeping occupational diseases as well as accidents, it would be unwise and artificial to require as a prerequisite to liability that the injury become manifested

before either the employee left the railroad or the employer ceased rail operations.

To satisfy the statute's temporal concern that an injury take place "while" the employee is employed by an interstate rail carrier, therefore, plaintiff need not show that a manifest injury occurred, but only that a harmful contact took place during that time. *Cf. ACandS, Inc. v. Aetna Casualty and Surety Co.*, 764 F.2d 968, 972–73 (3d Cir.1985) (under Pennsylvania law, insurance policy covering "bodily injury" is triggered inter alia by exposure to asbestos); *Insurance Company of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980) (insurance policy covering "bodily injury" is triggered by exposure to asbestos), *modified*, 657 F.2d 814 (6th Cir), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). The policy of compensation behind the Act is best furthered by requiring only that a part of the injurious process take place to satisfy the "while" clause.

*Conclusion*

I have stated that I believed in 1980 that my order 2004 precluded claims such as these from being pressed against the reorganized company. That was my intention. However, the power that I believed I had stemmed from the authority to discharge, and the court of appeals clearly has stated that discharge was unavailable to affect these claims.

Reading has zealously pressed novel arguments that provide a tempting invitation to achieve the result which I originally reached. However, to accept the invitation and reach that result would be to torture fundamental principles of reorganization law, successor liability, and federal tort law. This I am quite unwilling to do, as the damaging effect of accepting the invitation could be felt far beyond the confines of these cases.

Accordingly, Reading's motions must be denied and the cases will be returned to the calendars of the judges from whom they originally came.